UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| KRISTY L. LESSLEY, KARA J. RHODEHAMEL and KAYLA M. MESSER, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | |
| THE CITY OF MADISON, INDIANA, ALBERT G. HUNTINGTON, JIM LEE, DONALD JAMES ROYCE, ROBERT WOLF, JONATHON D. SIMPSON, MIKA SEASON JACKSON, WILLIAM WATTERSON, CHRISTOPHER STROUSE, JENNIFER LEE HENDRICK, JAMES HENDRICK, CLIFTY FIRE COMPANY NUMBER 6, and ROBERT L. BARLOW, II, | ) ) ) ) ) ) ) ) ) ) ) | CASE NO. 4:07-cv-0136-DFH-WGH |
| Defendants. | ) | |

ENTRY ON PENDING MOTIONS

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Summary Judgment Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Defendants' Motions for Summary Judgment . . . . . . . . . . . . . . . . . . . . . . 3
    I.     Undisputed Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    II.    Royce's Motion for Summary Judgment . . . . . . . . . . . . . . . . . . 10
        A.     Seizure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
        B.     Searches . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
            1.     Search of the Car . . . . . . . . . . . . . . . . . . . . . . . . . 16
            2.     Pat-Downs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
            3.     Strip-Searches . . . . . . . . . . . . . . . . . . . . . . . . . . 20
            4.     Royce's Participation in the Strip-Searches . . . . . . 24
        C.     Fifth Amendment Claims . . . . . . . . . . . . . . . . . . . . . . . 25
        D.     Qualified Immunity . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
            1.     Pat-Downs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
            2.     Strip-Searches . . . . . . . . . . . . . . . . . . . . . . . . . . 29
        E.     State Law Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

           1.    State Constitutional Claims . . . . . . . . . . . . . . . . . 30
           2.    State Tort Immunity . . . . . . . . . . . . . . . . . . . . . . . 31
    F.    New Federal Causes of Action . . . . . . . . . . . . . . . . . . . . 32
    G.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
II.    Other Police Officers' Motion for Summary Judgment . . . . . . . 33
    A.    Seizures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
    B.    Searches . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
           1.    "Search Incident to Probable Cause to Arrest" . . . . 34
           2.    Reasonableness of the Strip-Searches . . . . . . . . . 36
    C.    Qualified Immunity . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
    D.    State Law Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
    E.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
III.    Madison and Supervisory City Officials' Motion for
    Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
    A.    Supplemental Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
           1.    Madison Procedures . . . . . . . . . . . . . . . . . . . . . 40
           2.    Similar Incidents . . . . . . . . . . . . . . . . . . . . . . 41
           3.    Officer Misconduct and Investigations . . . . . . . . 42
           4.    Investigation and Statements to the Public . . . . . . 44
    B.    Municipal Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
    C.    Personal Liability of the Supervisory Defendants . . . . . . . 50
    D.    Defamation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
    E.    State Law Claims Against Officers . . . . . . . . . . . . . . . . . 54
           1.    Law Enforcement Immunity . . . . . . . . . . . . . . . 55
           2.    Battery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
           3.    Assault . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
           4.    False Arrest and False Imprisonment . . . . . . . . . . 59
    F.    Claims for Punitive Damages . . . . . . . . . . . . . . . . . . . . 60
    G.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
IV.    Fire Defendants' Motion for Summary Judgment . . . . . . . . . . . 61
    A.    Additional Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
    B.    State Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62
           1.    The Hendricks . . . . . . . . . . . . . . . . . . . . . . . . 62
           2.    Royce . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
           3.    Clifty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
    C.    Federal Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67
    D.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Plaintiffs' Motions for Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . 69
I.    Statement of Facts Construed Favorably for Defendants . . . . . . 70
II.    Plaintiffs' First Motion for Summary Judgment . . . . . . . . . . . . 71
    A.    Strip-Searches . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71
    B.    Qualified Immunity . . . . . . . . . . . . . . . . . . . . . . . . . . . 75
    C.    Law Enforcement Immunity . . . . . . . . . . . . . . . . . . . . . 75
    D.    Tort Claim Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

       E.      Conclusion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

III.   Plaintiffs' Second Motion for Summary Judgment . . . . . . . . . . 76

IV.   Plaintiffs' Third Motion for Summary Judgment  . . . . . . . . 77

V.    Plaintiffs' Fourth Motion for Summary Judgment  . . . . . . . . . . 77

Appeals of Magistrate Judge's Orders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

Motion to Amend Complaint  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

Motion to Open Discovery and Allow Further Summary Judgment Responses
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

Documents Under Seal  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

Conclusion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

*Introduction*

It all began with a broken license plate light.  One thing led to another, and the ensuing traffic stop in Madison, Indiana has become the subject of elaborate and expensive litigation that requires this lengthy tour through wide tracts of Fourth Amendment law, federal civil rights remedies, and state tort law.

On January 19, 2007, Madison police officers pulled over plaintiffs Kristy Lessley, Kara Rhodehamel, and Kayla Messer for a broken license plate light.  An officer smelled marijuana emanating from the car, and he searched the car.  He found either nothing or a trace amount of marijuana.  Another officer searched the plaintiffs' pockets.  He found nothing.  The officers then called a female Madison officer who performed warrantless strip-searches on the three plaintiffs at a local fire station.  The female officer found marijuana on Kristy Lessley.  Lessley was arrested and charged with possession of marijuana, but those charges were dismissed.  Plaintiffs filed this complaint against the officers involved in the stop and search, the City of Madison and many of its supervisory officials, and the fire station and two volunteer firefighters.  The complaint includes multiple state and federal claims.

Each side has filed four motions for summary judgment.  The court addresses first the defendants' motions, which are separated by defendant.  The court then addresses the plaintiffs' motions, which are separated by issue.  Plaintiffs have also filed a motion to amend the complaint and a motion to reopen

discovery and summary judgment briefing.  As detailed below, each side's motions are granted in part and denied in part.  Plaintiffs' core search claims under federal law survive, as do some of their state claims.  Plaintiffs' municipal liability claim also survives under federal law, but summary judgment is granted for the supervisory defendants on the individual claims against them.  Defendants have appealed two discovery orders of Magistrate Judge Hussmann.  One appeal is denied and the other is sustained.  Finally, at this late stage of the case, plaintiffs will not be permitted to amend the complaint to add an entirely new defendant, the city's liability insurer.

*Summary Judgment Standard*

Summary judgment must be granted if the record shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A factual issue is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party.  See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual issue is material if resolving the factual issue might change the suit's outcome under the governing law.  *Id.*  The motion should be granted only if no rational fact finder could decide in favor of the non-moving party.  *Id.* at 249-50.

When ruling on a motion for summary judgment, the court must view all the evidence in the record in the light most favorable to the non-moving party and

must resolve all factual disputes in that party's favor.  See *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).  The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251-52.  Because both sides have moved for summary judgment, the court must consider the evidence through two different lenses.  When considering defendants' motions, the court gives plaintiffs the benefit of conflicts in the evidence and favorable inferences.  When considering plaintiffs' motions, defendants receive those benefits.

*Defendants' Motions for Summary Judgment*

I.      *Undisputed Facts*

For purposes of defendants' motions, the court describes the disputed events surrounding the January 19, 2007 stop and search of the plaintiffs in the light most favorable to the plaintiffs.  This version of the facts will remain operative for each of defendants' motions for summary judgment.  The court will supplement the facts where necessary.  When the court addresses the plaintiffs' motions for summary judgment, it notes how the assumed facts differ.

On January 19, 2007, plaintiffs Kristy Lessley, Kara Rhodehamel, and Kayla Messer were riding in Rhodehamel's car.  Lessley and Rhodehamel each possessed a small bag of marijuana.  Lesssley Dep. 32-33.  Rhodehamel drove, Lessley sat

in the front passenger seat, and Messer sat behind Rhodehamel.  Lessley Dep. 36; Rhodehamel Dep. 41.  While in the car, they each smoked from a marijuana cigarette.  Lessley Dep. 38; Messer Dep. 25.  After plaintiffs smoked the cigarette, they noticed a police car following their car.  Messer Dep. 28.  Rhodehamel then gave her bag of marijuana to Lessley, and Lessley placed the two baggies into her underwear.  Lessley Dep. 47, 49.

Madison police officer Jonathon Simpson pulled over Rhodehamel's car because the license plate light was not working.   Simpson Dep. 45-47.  Rhodehamel parked in a church parking lot.  Simpson Dep. 47.  This traffic stop for a license plate light attracted three police cars.  Two police cars parked behind Rhodehamel's car, and one police car parked in front of it.  Lessley Dep. 51-52.  Officer Simpson approached the car.  He saw rolling papers in the car and smelled marijuana.  Simpson Dep. 51.  He asked for and received Rhodehamel's license and registration.  Rhodehamel Dep. 87.  Sergeant James Royce approached the car and instructed Lessley to get out of the car.  Lessley Dep. 63; Rhodehamel Dep. 94.  Royce placed Lessley in the front seat of his patrol car.  Lessley Dep. 68.  At the same time, Officer Simpson asked Rhodehamel and Messer to get out of the car.  Rhodehamel Dep. 94; Messer Dep. 52.  He placed Rhodehamel and Messer in his patrol car.  Messer Dep. 52.

Officer Simpson told Rhodehamel that he was going to search her car.  Rhodehamel Dep. 99; Messer Dep. 52.  He did not ask for consent to search the

car.   Rhodehamel Dep. 98-99; Messer Dep. 52.   Simpson, along with officers Christopher Strouse and William Watterson, searched the car.   Rhodehamel Dep. 105, 109.   They searched Messer's and Rhodehamel's purses in the car. Watterson Dep. 30; Rhodehamel Dep. 99-100.   Simpson's deposition testimony does not clarify whether or when he found marijuana in Rhodehamel's car.   He first testified that he found only rolling papers and that he completed the search before Royce took the plaintiffs to the fire station.   Simpson Dep. 56.   He then testified that he continued searching the car after Royce left the scene with the plaintiffs and found "two green leafy pieces."   Simpson Dep. 68.   Finally, he testified that he found the pieces in the car before Royce took the plaintiffs to the fire station.   Simpson Dep. 100-01.   Royce reported that Simpson found "small stems" in the car before Royce took the plaintiffs to the fire station.   Dkt. No. 105, Ex. 5 at 25.   Royce testified that Simpson found marijuana in the car before Royce discussed a strip search with Lessley.   Royce Dep. 101.   Giving plaintiffs the benefit of the conflicting accounts, the court assumes that Officer Simpson did not find marijuana in the car at any time.

Sergeant Royce questioned Lessley while she was in his car.   He did not read *Miranda* rights to her.   Lessley Dep. 77-78.   Royce smelled marijuana on Lessley, told her this, and asked her to give him the marijuana.   Lessley Dep. 70, 74; Royce Dep. 86, 89.[1]   Lessley told Royce that she did not have marijuana.

---

[1]Officer Mika Season Jackson, who later performed the strip-searches of the plaintiffs, testified that she did not smell marijuana on any of the plaintiffs when
(continued...)

Lessley Dep. 77, 165.  Royce instructed Lessley to get out of the car and to pull out her pants pockets and open her jacket.  Lessley Dep. 74-75.  While Lessley was wearing the jacket, Royce placed his hands in the jacket's breast pockets, and his hand came into contact with her chest.  Lessley Dep. 76.  Royce found nothing and instructed Lessley to get back into his car.  Lessley Dep. 77.

Sergeant Royce then spoke to Rhodehamel behind Simpson's patrol car.  Rhodehamel Dep. 111.  He did not read *Miranda* rights to her.  *Id.*  Royce instructed Rhodehamel to pull out her pants pockets, and he inserted his hands into the pockets on her jacket.  He found nothing.  Rhodehamel Dep. 111, 115.

Sergeant Royce then spoke to Messer.  He did not read *Miranda* rights to her.  Messer Dep. 56-58.  Royce instructed Messer to pull out her pants pockets, and he put his hands through the stomach pocket in her hoodie sweater.  He found nothing.  Messer Dep. 58-59.  All three plaintiffs testified that they do not believe that Royce received sexual gratification from these searches.  Rhodehamel Dep. 114-15, 118; Messer Dep. 59; Lessley Dep. 77.  Neither Rhodehamel nor Messer told Royce that Lessley possessed marijuana.   Messer Dep. 60; Rhodehamel Dep. 112.

---

[1](...continued)
she searched them.  Jackson Dep. 77.

With the plaintiffs in police cars, the officers discussed the situation. Eventually, Royce called police dispatch and requested a female officer to perform a more thorough search.  Royce Dep. 106.  Female Madison officer Mika Season Jackson arrived at the scene.  Lessley Dep. 84.  Plaintiffs then got into Royce's vehicle, and Royce drove them to a nearby fire station, Clifty Fire Company Number 6.  Royce Dep. 109-10.  Royce took the plaintiffs into the fire station and directed them to sit in chairs.  Lessley Dep. 89-90; Messer Dep. 66; Rhodehamel Dep. 127.  Royce introduced the plaintiffs to Officer Jackson.  Lessley Dep. 90. No officer asked the plaintiffs to consent to a strip-search.  Lessley Dep. 82-83, 91-92; Rhodehamel Dep. 123, 128; Messer Dep. 64, 67-68.  No plaintiff signed Madison's "Consent to Search" form.  Royce Dep. 112.  However, at some point, Royce briefed Jackson on the situation.  He told her that each plaintiff had consented to "the search."  Jackson Dep. 44.

Royce left the room and entered the front room of the fire station where he saw volunteer firefighter and Louisville police officer Jennifer Hendrick, her husband Clifty Fire Captain James Hendrick, and two unnamed people.  Royce Dep. 112-14.  Royce asked Jennifer Hendrick if she would join him in watching the women.  Royce Dep. 114.  Royce said an investigation was occurring and asked James Hendrick to keep the other occupants of the front room in the room. Wolf Dep. 74, 170.  James Hendrick never encountered the plaintiffs, and he was not aware that searches were occurring.  James Hendrick Dep. 50-52.  After they left the front room, Royce told Jennifer Hendrick that Jackson was going to search

the plaintiffs in the bathroom following a traffic stop.  Royce Dep. 114.  Royce introduced Jennifer Hendrick to the plaintiffs as a Louisville police officer.  Royce Dep. 114-15; Jennifer Hendrick Dep. 58-59.  Jennifer Hendrick asked Lessley and Messer if they possessed marijuana.  Lessley Dep. 94; Messer Dep. 70.

Jackson strip-searched each plaintiff in a windowless fire department bathroom with a solid door.  Lessley Dep. 99; Messer Dep. 72-73; Rhodehamel Dep. 130.  The door was closed during the searches.  Messer Dep. 76, 80-81; Rhodehamel Dep. 130.  Jackson searched Rhodehamel first.  Jackson instructed Rhodehamel to remove all of her clothes except her bra and underwear.  Rhodehamel Dep. 132-34.  Jackson instructed Rhodehamel to pull her bra forward and shake the bra cups, exposing her breasts.  Rhodehamel Dep. 133.  Jackson then instructed Rhodehamel to pull her underwear below her knees and to spread her legs while squatting.  Rhodehamel Dep. 135.  Jackson found no marijuana on Rhodehamel and instructed her to get dressed and leave the bathroom.  Rhodehamel Dep. 136.

Jackson searched Messer next.  Messer was searched in the same manner as Rhodehamel, but her breasts were not exposed.  Messer Dep. 74-76.  Jackson searched Lessley in the same manner as Rhodehamel.  Lessley Dep. 100-04.  Before she would have had to squat down, however, Lessley pulled two bags of marijuana from her underwear and handed them to Jackson.  Lessley Dep. 102.

Jackson told Royce that she found marijuana on Lessley.  Royce placed Lessley under arrest and handcuffed her.  Lessley Dep. 106.  Royce took the plaintiffs to his car and placed Lessley in the front seat while Messer and Rhodehamel got into the back seat.  Lessley Dep. 108.  As Royce buckled Lessley's seatbelt, his hands touched her breasts.  Lessley Dep. 115.  As he began driving, Royce reported his mileage to dispatch (a practice for him when he is transporting women) and drove back to the site of the original traffic stop.  Royce Dep. 123.  At the site of the traffic stop, Sergeant Royce told Officer Simpson that Officer Jackson had found marijuana on Lessley.  Royce Dep. 123-24.  Simpson released Messer and Rhodehamel.  Simpson Dep. 74.

After Messer and Rhodehamel returned to Rhodehamel's car, Royce was alone in his car with Lessley and drove her to jail.  Royce picked up the marijuana baggies, placed them under his nose, and said to Lessley that the marijuana smelled "like really good stuff."  Lessley Dep. 111.  Royce then told Lessley that there were other ways that the situation could be handled, leading Lessley to believe that Royce wanted a sexual favor.  Lessley Dep. 111-12.  Royce also said that he would deny making the statement.  Lessley Dep. 111.  Royce never explicitly asked Lessley to perform a sexual act.  Lessley Dep. 112.

Lessley was booked at the jail and released on bond.  Lessley Dep. 118-19; Messer Dep. 95.  Lessley was charged with possession of marijuana in Jefferson Superior Court.  Dkt. No. 112, Tab 4.  Lessley later filed a motion to suppress, and

the state responded by dismissing the charges.  *Id.*  Plaintiffs filed this civil action

on October 15, 2007.

II.     *Royce's Motion for Summary Judgment*

Royce has moved for summary judgment on many of the federal and state

claims against him.  Summary judgment is appropriate for some of the federal

claims, but not for plaintiffs' core strip-search claim.  Indiana law gives Royce

immunity from personal liability for the state law claims.  Unless otherwise noted,

the court addresses the federal claims.  Royce's motion does not mention every

claim in the complaint.  Summary judgment is granted only to the extent specified

in this entry.[2]

---

[2]Plaintiffs did not properly designate facts in opposition to this specific
motion.  Because of the volume of filings in this case, the court has applied to this
motion the designations of facts from other briefs.  Where a fact was properly
designated by one party, the court has applied it to other parties.

A.      *Seizure*

Sergeant Royce argues that plaintiffs' federal false arrest and false imprisonment claims fail because there was probable cause to arrest the plaintiffs. The court agrees that the officers had probable cause to arrest the plaintiffs.[3]

Royce first points out that Simpson had probable cause to pull over the plaintiffs because it is an infraction to drive with a broken license plate light. Plaintiffs agree.  Royce then argues that there was probable cause to detain the plaintiffs because the officers smelled marijuana in the car and the officers saw rolling papers in the car.  Finally, he argues that there was probable cause to arrest Lessley formally because Jackson found marijuana in Lessley's possession.

The existence of probable cause to arrest a person bars federal Fourth Amendment claims for false arrest and false imprisonment.  *Schertz v. Waupaca County*, 875 F.2d 578, 582 (7th Cir. 1989).  "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the

---

[3]Royce captions his argument as referring to the plaintiffs' "unreasonable seizure" claim, but his argument discusses only false arrest and false imprisonment.  The court adopts the parties' terms and discusses the plaintiffs' Fourth Amendment seizure claim by referring to false arrest and false imprisonment, but the court views plaintiffs' Fourth Amendment seizure claim as one of unreasonable seizure.  The court's analysis applies to an unreasonable seizure claim.  Absent excessive force or a similar circumstance, probable cause to arrest bars a claim of unreasonable seizure.  See *Washington v. Haupert*, 481 F.3d 543, 547 (7th Cir. 2007) (plaintiffs must show they were arrested without probable cause to succeed on claim of unreasonable seizure).  Messer and Rhodehamel were not formally arrested, but they were certainly seized when they were detained, searched, transported to the fire station, and then strip-searched.

arresting officer at the time of the arrest." *Devenpeck v. Alford,* 543 U.S. 146, 152 (2004).  Probable cause to arrest exists when an officer possesses "knowledge from reasonably trustworthy information that is sufficient to warrant a prudent person in believing that the suspect has committed, or is committing, a crime." *United States v. Hobbs*, 509 F.3d 353, 359-60 (7th Cir. 2007), quoting *United States v. Brown*, 366 F.3d 456, 458 (7th Cir. 2004).

When Simpson smelled marijuana in the vehicle, he had probable cause to search the vehicle.  He did not need a warrant.  See *United States v. Franklin*, 547 F.3d 726, 733 (7th Cir. 2008).  Royce smelled marijuana on Lessley, which gave him probable cause to believe that she possessed marijuana, so her federal seizure claims fail.  See *United States v. Humphreys*, 372 F.3d 653, 659 (4th Cir. 2004) (smell of marijuana emanating from area does not give officers probable cause to believe that all individuals in area possess marijuana, but "if an officer smells the odor of marijuana in circumstances where the officer can localize its source to a person, the officer has probable cause to believe that the person has committed or is committing the crime of possession of marijuana").

Though it is a closer question, the officers also had probable cause to arrest Messer and Rhodehamel because of the smell of marijuana emanating from Rhodehamel's vehicle.  The Supreme Court faced a similar situation in *Maryland v. Pringle*, 540 U.S. 366 (2003).  In *Pringle*, officers pulled over a small car for speeding a little after 3:00 a.m.  An officer observed a large roll of money

in the car's glove compartment.  The officer obtained consent to search the car and found five baggies of cocaine in the back-seat armrest.  After all three occupants denied knowledge of the cocaine, the officer arrested all three.  One occupant confessed to possession of cocaine at the police station, but he moved to suppress the confession as the fruit of an illegal arrest.  540 U.S. at 368-69.  The Supreme Court held that there was probable cause to arrest all three of the occupants of the car, including Pringle, who was the front seat passenger.  The Court explained that the officer reasonably inferred "that any or all three of the occupants had knowledge of, and exercised dominion and control over, the cocaine.  Thus, a reasonable officer could conclude that there was probable cause to believe Pringle committed the crime of possession of cocaine, either solely or jointly."  *Id.* at 372.  But see Wayne R. LaFave, 2 Search & Seizure § 3.6(b) at 313-14 (4th ed. 2004) ("The detection of the odor of marijuana in a certain *place* will not inevitably provide probable cause to arrest a *person* who is at that place. . . .  Similarly, it has been held . . . that a passenger in an automobile may not be arrested simply because the odor of marijuana is emanating from the car.").

The court sees no principled distinction between this case and *Pringle*.  The plaintiffs in this case were traveling in a private passenger car.  Simpson smelled marijuana, which suggested that at least one of the occupants had been smoking marijuana in the presence of the others.  While some commentators have criticized the Court's analysis in *Pringle*, see, *e.g.*, Wayne R. LaFave, 2 Search & Seizure § 3.6(c) at 343-47 (4th ed. 2004), the case holds that the presence of contraband

-13-

in a small private passenger vehicle, combined with circumstances suggesting that other occupants know of the contraband, provides officers probable cause to arrest all of the occupants for possession of the contraband.  In this case, the smell of marijuana indicated that there was marijuana in the vehicle and that all the occupants knew it.[4]  Indiana criminalizes the constructive possession of marijuana, with a standard similar to the "knowledge and exercise of dominion and control" standard applied by the Supreme Court in *Pringle*.  See *Gee v. State*, 810 N.E.2d 338, 340 (Ind. 2004); *Goliday v. State*, 708 N.E.2d 4, 6 (Ind. 1999).

The officers had probable cause to arrest each plaintiff for constructive possession of marijuana.  Because Royce had probable cause to arrest Lessley, it is not necessary to reach Royce's additional argument that Lessley cannot recover damages from her formal arrest, imprisonment, and prosecution, which were caused by marijuana found in the search.  Royce is entitled to summary judgment on the plaintiffs' seizure claims.

B.      *Searches*

---

[4]Royce includes the presence of marijuana stems in the vehicle as evidence that supported probable cause for constructive possession.  However, defendants' testimony that one of the officers found trace amounts of marijuana in the car is conflicting.  Based on the conflicting evidence, a reasonable jury could determine that the officers did not find any marijuana in the car.  See *Kingsland v. City of Miami*, 382 F.3d 1220, 1227 (11th Cir. 2004) (reversing grant of summary judgment and refusing to credit officers' conflicting allegations that vehicle smelled of marijuana); Simpson Dep. 56 (testifying that he found no marijuana when he searched the car).

Sergeant Royce argues that all the searches were constitutional because they were reasonable.  The Fourth Amendment prohibits "unreasonable searches." U.S. Const. Amend. IV.  It does not require that all searches be supported by a warrant, but the Supreme Court has established that warrantless searches of a person are presumptively unreasonable. *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1268 (7th Cir. 1983), citing *New York v. Belton*, 453 U.S. 454, 457 (1981).[5]

Recently some courts have tempered the warrant requirement with a more open-ended focus on "reasonableness" that requires courts to balance "the need for the particular search against the invasion of personal rights that the search entails."  See *Campbell v. Miller*, 499 F.3d 711, 716 (7th Cir. 2007), quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979).[6]  The balancing test requires the court to consider the scope of the particular intrusion, how it was conducted, the justification for the search, and the place where it was conducted.  *Campbell*, 499 F.3d at 716.  As a search becomes more intrusive, officers must come closer to demonstrating probable cause for the search.  *Id.*  In this case, the officers conducted three warrantless searches.  First, they searched the car.  Second, Royce patted down the plaintiffs.  Third, Jackson strip-searched the plaintiffs at

[5]Plaintiffs also allege that Royce invaded their privacy, First Am. Compl. ¶ 128, and violated their right to be free from unreasonable searches, First Am. Compl. ¶ 132.  The court addresses the search claim because the parties do not discuss the more nebulous invasion of privacy claim and because the applicable Fourth Amendment law is controlling and well developed.

[6]For a discussion of the tension between the warrant requirement and the reasonableness test, see *California v. Acevedo*, 500 U.S. 565, 581-85 (1991) (Scalia, J., concurring in the judgment).

Royce's direction.  Under either standard, the search of the car and the pat-down of Lessley were constitutional.  The pat-downs of Messer and Rhodehamel and all three strip-searches were not constitutional.

> 1.      *Search of the Car*

After Simpson smelled marijuana, Simpson and Royce told the plaintiffs to get out of the car.  They placed the plaintiffs in their patrol cars, and Simpson, Strouse, and Watterson searched the car and the purses in the car.  This search was constitutional.  Police may search a vehicle if they have probable cause to believe that the vehicle contains contraband.  *Maryland v. Dyson*, 527 U.S. 465, 467 (1999).  The smell of marijuana gave the officers probable cause to search the car, *United States v. Franklin*, 547 F.3d 726, 735 (7th Cir. 2008), and its contents, see *Wyoming v. Houghton*, 526 U.S. 295, 301 (1999).

###### 2.     *Pat-Downs*

Royce directed each plaintiff to empty her pants pockets, and he patted down some of each plaintiff's clothing.  Plaintiffs deny consenting to the searches. Despite the lack of consent, Royce argues that the searches were legal because he had probable cause to believe that evidence would be found.

Ordering the plaintiffs to empty their pockets and patting down their clothes was a significant infringement on their privacy, one that required probable cause to believe that contraband would be found.  "A 'careful tactile exploration of the outer surfaces of a person's clothing all over his or her body' is a 'serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly.'" *Bond v. United States*, 529 U.S. 334, 337 (2000), quoting *Terry v. Ohio*, 392 U.S. 1, 16-17 (1968). Probable cause was required to support the searches whether the court adheres to the warrant requirement or the balancing approach.  See *United States v. Chaidez*, 919 F.2d 1193, 1196 (7th Cir. 1990) (warrant requirement treats searches "without probable cause" as unreasonable); *Campbell*, 499 F.3d at 716 ("The more intrusive the search, the closer governmental authorities must come to demonstrating probable cause for believing that the search will uncover the objects for which the search is being conducted.").[7]

_____

[7]Neither the pat-downs nor the strip-searches were justified as searches incident to arrest.  A search incident to arrest is an exception to the warrant requirement, but this exception requires an actual (and legal) arrest.  The search

(continued...)

Based on the odor, Sergeant Royce had probable cause to believe that the pat-down of Lessley would reveal marijuana, but he did not have probable cause to believe that the pat-downs of Messer and Rhodehamel would reveal marijuana. The only evidence suggesting that Messer and Rhodehamel possessed marijuana was the smell of marijuana emanating more generally from the car.  While the odor might have given the officers probable cause to arrest Messer and Rhodehamel under a constructive possession theory, they were not actually arrested.  The odor alone did not give the officers probable cause to search them. Probable cause to search is different from probable cause to arrest.  See *United States v. Humphries*, 372 F.3d 653, 659 (4th Cir. 2004) ("In the search context, the question is whether the totality of circumstances is sufficient to warrant a reasonable person to believe that contraband or evidence of a crime will be found in a particular place. . . .  Whereas in the arrest context, the question is whether the totality of the circumstances indicate to a reasonable person that a 'suspect has committed, is committing, or is about to commit' a crime."), quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979).

---

[7](...continued)

may precede the arrest, but the two must be close temporally.  See *Rawlings v. Kentucky*, 448 U.S. 98, 111 (1980) ("Where the formal arrest followed quickly on the heels of the challenged search of petitioner's person, we do not believe it particularly important that the search preceded the arrest rather than vice versa.").  The strip-search of Lessley does not fit within the search incident to arrest exception because the fruits of the search were the basis for the arrest.  See *Sibron v. New York*, 392 U.S. 40, 63 (1968) ("It is axiomatic that an incident search may not precede an arrest and serve as part of its justification.").

The smell of marijuana was not sufficient to establish probable cause to search specific to Messer and Rhodehamel.  The Supreme Court has held that probable cause to search a car does not give an officer probable cause to search the persons of all of its occupants.  *United States v. Di Re*, 332 U.S. 581 (1948). In *Di Re* officers approached a car and viewed one occupant with counterfeit ration coupons.  The officers arrested the occupants of the car, including Di Re.  At the police station the officers searched Di Re and discovered more counterfeit coupons in his clothes.  The government defended the search in part on the ground that the probable cause to search the car gave the officers probable cause to search the occupants.  Addressing probable cause, the Court defined the question presented as:  "assuming . . . that there was reasonable cause for searching the car, did it confer an incidental right to search Di Re?"  *Id.* at 586.  The Court's answer was no.  *Id.* at 587; see also *United States v. Soyland*, 3 F.3d 1312, 1314 (9th Cir. 1993) (passenger's presence in a car that had marijuana cigarettes, pipe with marijuana residue, and odor of methamphetamine did not provide probable cause to frisk him).  *Pringle* does not limit *Di Re's* applicability to this case.  *Pringle* involved an arrest after cocaine was found in a search of an automobile, and it justified the arrest on the theory that the car occupants "had knowledge of, and exercised dominion and control over, the cocaine."  *Maryland v. Pringle*, 540 U.S. 366, 372 (2003).  This is not the same as a determination that a search of the occupants may reveal contraband.  Royce did not have probable cause to pat-down Messer and Rhodehamel.  He did have probable cause to pat down Lessley,

so he is entitled to summary judgment on her claim that the pat-down was unconstitutional.


                    3.      *Strip-Searches*

After Sergeant Royce transported the plaintiffs to the fire station, Officer Jackson strip-searched each plaintiff.  Royce argues that the warrantless strip-searches of three young women who were not then under arrest complied with the Fourth Amendment.  The court disagrees.[8]


It should go without saying that strip-searches are highly invasive.  See *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1272 (7th Cir. 1983) ("We can think of few exercises of authority by the state that intrude on the citizen's privacy and dignity as severely as the visual anal and genital searches practiced here."). Jackson, a female officer, performed the searches in a closed bathroom alone with the plaintiff being searched.  Jackson ordered each plaintiff to remove all of her clothes except her bra and her underwear.  She ordered each plaintiff (except Lessley, who eventually produced marijuana) to pull out her bra cups.  Finally, she ordered each plaintiff to pull her underwear below her knees and to squat down. To support this extreme and warrantless invasion of the plaintiffs' privacy, Royce had probable cause to believe that Lessley possessed marijuana.  By the

---

        [8]Royce suggests that the searches may have been incident to arrest, but he does not develop this argument.  The court will not pursue the question of whether plaintiffs were under arrest, such that the searches were justified as searches incident to arrest, without the parties briefing the issue.

time these searches occurred, no officer had probable cause to believe that Messer or Rhodehamel possessed marijuana on their persons.

The lack of probable cause to believe that the strip-searches would reveal marijuana ends the inquiry as to Messer and Rhodehamel.  If the pat-downs were unconstitutional without probable cause, the more invasive strip-searches were unconstitutional as well.  The strip-search of Lessley also violated the Fourth Amendment.  While probable cause supported the search, warrantless strip-searches are sufficiently invasive that more than probable cause that a small amount of marijuana will be found is required.

This court addressed a similar situation in *Gray v. City of Columbus*, where the court held that a police officer was not entitled to qualified immunity when she performed a strip-search and body-cavity search on a woman and her twenty-two month old son.  2000 WL 683394 (S.D. Ind. Jan. 31, 2000).  In that case, Gray and her son were passengers in a car.  An officer pulled over the car, searched the car, and found burnt marijuana joints in the car.  The officer arrested the driver and transported Gray and her son to the police station.  Gray and her son were not arrested.  While at the station, a female officer ordered Gray and her son to submit to the strip-searches in a bathroom.  The court held that the searches were unconstitutional:  "the suggestion that American law enforcement officers have the authority, without a search warrant, to use the power of their badges and

-21-

uniforms to conduct a strip search and body cavity search of a person who is not under arrest is simply stunning."  *Gray*, 2000 WL 683394, at *10.


*Gray* accurately described the law in the Seventh Circuit.  Strip-searches are permitted only in limited circumstances.  Royce has identified no case in this district, any circuit, or from the Supreme Court where a court approved a warrantless strip-search of an individual who was not under arrest, at an international border, or at a school.[9]  To the court's knowledge, the Seventh Circuit has approved warrantless strip-searches only in the arrest, school, and border contexts.  See *Campbell v. Miller*, 499 F.3d 711, 718 (7th Cir. 2007) (holding that strip-search incident to arrest was not *per se* unreasonable when supported by a reasonable suspicion that contraband would be found, but holding that search was performed in an unreasonable manner when conducted in public view); *Cornfield v. Consolidated High School Dist. No. 230*, 991 F.2d 1316 (7th Cir. 1993) (school officials did not violate sixteen-year old student's constitutional rights when they strip-searched him based on a reasonable suspicion that he was concealing drugs); *Saffell v. Crews*, 183 F.3d 655 (7th Cir. 1999) (customs

---

[9]Searches at schools may be performed with less suspicion and with fewer protections for the individual searched because of the interests of "teachers and administrators in maintaining discipline in the classroom and on school grounds." *New Jersey v. T.L.O.*, 469 U.S. 325, 339 (1985).  Nevertheless, students are still protected against unjustified and unreasonable searches.  *Id.* at 342 (search by school official can be supported by reasonable suspicion, but scope and manner of search must be reasonable); see *Safford Unified School Dist. No. 1 v. Redding*, 129 S.Ct. 2633, 2639 (2009) (holding that strip-search of student was unreasonable under the circumstances but that school officials were protected from personal liability by qualified immunity).

inspector entitled to qualified immunity for strip-search at international airport's customs checkpoint).

Under circumstances different from those in *Cornfield*, the Seventh Circuit rejected the use of strip-searches at a school in *Doe v. Renfrow*, 631 F.2d 91, 92-93 (7th Cir. 1980) (holding that school officials were not entitled to qualified immunity).  The Seventh Circuit has also held that even a lawful arrest does not necessarily justify a strip-search.  See *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1273 (7th Cir. 1983) (holding that city's policy of performing a custodial strip-search of women arrested for misdemeanors without a reasonable suspicion that the women were concealing contraband was unconstitutional); *Campbell*, 499 F.3d at 718-19; see also *Doan v. Watson*, 168 F. Supp. 2d 932 (S.D. Ind. 2001) (holding that policy of strip-searching and delousing all prisoners without individualized suspicion that prisoners had contraband violated the Fourth Amendment); *Thomas v. Wyser*, 2008 WL 474216, at *12 (S.D. Ind. Feb. 15, 2008) (stating that policy of strip-searching all prisoners incarcerated for felonies may

be unconstitutional).[10]  Based on plaintiffs' evidence here, the warrantless strip-searches of the plaintiffs, not incident to arrest, were unconstitutional.

### 4.   *Royce's Participation in the Strip-Searches*

Sergeant Royce argues that even if the strip-searches were unreasonable, he is not liable for them because he did not perform them.  By its terms, section 1983 imposes liability on persons who "cause" a deprivation of rights under federal law.  This requires personal responsibility.  *Rascon v. Hardiman*, 803 F.2d 269, 273 (7th Cir. 1986).  "A causal connection, or an affirmative link, between the misconduct complained of and the official sued is necessary."  *Id.*, quoting *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983); accord, *Nanda v. Moss*, 412 F.3d 836, 842 (7th Cir. 2005) ("Under § 1983, however, supervisory liability can be established if the conduct causing the constitutional deprivation occurs at the supervisor's direction or with the supervisor's knowledge and consent.").

---

[10]Royce disputes this proposition and cites two cases where he argues that courts approved warrantless strip-searches of individuals who were not under arrest, at a school, or at a border.  In *United States v. Diaz*, 2006 WL 3020903 (N.D. Cal. Oct. 23, 2006), the court denied a motion to suppress drugs found from a warrantless strip-search that was conducted after the defendant was handcuffed (but apparently not arrested) and transported to a police station.  The court said that the police had probable cause to believe that Diaz possessed drugs, which was sufficient to support the warrantless strip-search.  A district court case in another circuit cannot alter clearly established law in this circuit.  In *Preston v. Wise*, 2006 WL 1285116 (N.D. Ind. May 8, 2006), the district court upheld the strip-search of a fourteen-year old girl who was taken into custody after she was with her father when he was arrested for selling cocaine.  It appears that the girl was under arrest, though the opinion is not clear on this point.

Sergeant Royce was personally responsible for these strip-searches.  Royce took the plaintiffs to the fire station.  He caused Jackson to be called to perform the searches.  He discussed the searches with Jackson, though the extent of their discussions is unclear.  He told Jackson that the plaintiffs had consented to the searches.  A jury may determine how much damage Royce caused through his participation in the strip-searches, but the evidence would easily allow a jury to conclude that he caused those violations of their constitutional rights.

C.    *Fifth Amendment Claims*

Plaintiffs have withdrawn their Fifth Amendment claims.  Dkt. No. 163.

D.    *Qualified Immunity*

The doctrine of qualified immunity provides a complete defense to a claim for damages against a defendant sued in his individual capacity under § 1983. A defendant is entitled to qualified immunity if he did not violate "clearly established" rights at the time of the conduct in question.   See *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Royce is not entitled to qualified immunity for any of the surviving search claims.

The test of whether a right is clearly established is objective.  To show that a defendant violated a clearly established right, the plaintiffs must show "that a violation of [the] right has been found in factually similar cases, or that the

violation was so clear that a government official would have known that his actions violated the [plaintiffs'] rights even in the absence of a factually similar case." *Lee v. Young*, 533 F.3d 505, 512 (7th Cir. 2008).  The right must have been clearly established when the defendants' actions occurred, not at the time of the lawsuit.  See *Kiddy-Brown v. Blagojevich*, 408 F.3d 346, 353 (7th Cir. 2005).

     1.    *Pat-Downs*

As explained above, Royce lacked the probable cause necessary to justify the pat-down searches of Rhodehamel and Messer.  Royce is not entitled to immunity on these claims because it was clearly established that the smell of marijuana and presence of rolling papers – without more – does not provide an officer probable cause to believe that the occupants of a car possess marijuana on their persons.[11]

---

[11]Royce suggests, without explanation or citation to any case, that an exigent circumstance such as the safety of others or destruction of evidence might have justified the pat-downs and strip-searches. Dkt. No. 139 at 28-29, 34.  No evidence suggests that the officers believed the plaintiffs might have possessed weapons, which might have permitted a pat-down search based on a lower level of suspicion such as reasonable suspicion.  Compare *Terry v. Ohio*, 392 U.S. 1, 28-30 (1968) (stop-and-frisk permissible where officer had reasonable grounds to believe that criminal activity was afoot and reasonable grounds to believe that the suspect was armed), with *Sibron v. New York*, 392 U.S. 40, 63-65 (1968) (officer violated Fourth Amendment by putting his hand into suspect's pocket without probable cause or grounds to believe that suspect was armed).  The court is not aware of any American court holding that an officer may perform a pat-down of a person not suspected of being armed, without probable cause to believe that the person possesses contraband, on the mere suspicion that the person might destroy contraband if she is not searched.

To search each plaintiff, the officers needed probable cause to believe that the search would uncover marijuana.  This is different from a determination that the plaintiffs committed a crime, which would have permitted the officers to arrest the plaintiffs.  *United States v. Di Re*, 332 U.S. 581 (1948), established long ago that a person's presence in a car with another person who possesses contraband does not, without more, give officers probable cause to believe that the person possesses contraband on his or her person.  That holding clearly applies here.  Also, in this case, a jury could conclude that the officers found no contraband in Rhodehamel's car.  The Ninth Circuit has held that the odor or presence of drugs in a car does not give an officer probable cause to search all of the occupants for drugs.  *United States v. Soyland*, 3 F.3d 1312, 1314 (9th Cir. 1993).  *Pringle* does not change this outcome because it dealt with probable cause to arrest, not to search.  Similarly, in *Wyoming v. Houghton*, 526 U.S. 295, 303 (1999), the Supreme Court took care to distinguish between searching a car and its contents, which was permissible, and searching the persons of the occupants, which was barred by *United States v. Di Re*, 332 U.S. 581 (1948), because searches of persons are so much more intrusive and even traumatic.

However, several state courts and at least one district court have held that the odor of marijuana emanating from a car provides probable cause that the occupants possess marijuana so that a search of persons would be permitted.  See, *e.g.*, *Garcia v. Aguiar*, 138 F. Supp. 2d 298, 303 (N.D.N.Y. 2001) (odor of marijuana emanating from car with four occupants gave officers probable cause

to frisk driver); *State v. Chambliss*, 752 So.2d 114, 115 (Fla. App. 2000).  But see, *e.g.*, *People v. Harshbarger*, 321 N.E.2d 138, 140-41 (Ill. App. 1974) (applying *Di Re* to conclude that person's presence in apartment that smelled of marijuana did not provide probable cause for arrest and search of person).

The rule that the smell of marijuana emanating from a car combined with the presence of rolling papers on a floorboard does not give officers probable cause to believe that a search of each of the occupants will uncover contraband was clearly established on January 19, 2007.  *Di Re* established in 1948 that probable cause to search a person cannot be established by association under closely analogous circumstances.  At least one other circuit has adapted the rule to the precise situation presented in this case.  Indiana courts have not addressed the question.  The fact that some state courts have not adopted this principle cannot protect a police officer from section 1983 liability.  It is also significant that the officers had information that localized the presence of marijuana to a different occupant – Lessley – and nonetheless chose to search Messer and Rhodehamel. Royce is not entitled to qualified immunity for the pat-down searches of Messer and Rhodehamel.

2.    *Strip-Searches*

Sergeant Royce can be liable for the strip-searches of Messer and Rhodehamel, like the pat-down searches, because there was no probable cause

to support the searches.  Additionally, even though Royce had probable cause to believe that a search of Lessley would reveal marijuana, as it later did, it was clearly established that all of the warrantless strip-searches not incident to arrest and not performed in a school or at a border were unconstitutional.

While the plaintiffs cannot point to a case decided by the Supreme Court or the Seventh Circuit holding a strip-search to be unconstitutional in similar circumstances, a precedential case is not necessary.  A plaintiff can defeat qualified immunity by showing "that the violation was so clear that a government official would have known that his actions violated the plaintiff's rights even in the absence of a factually similar case."  *Lee v. Young*, 533 F.3d 505, 512 (7th Cir. 2008).

In *Gray*, this court held that it was clearly established that warrantless strip-searches not incident to arrest are unconstitutional.  *Gray*, 2000 WL 683394, at *10.  For purposes of qualified immunity, the district court decision in *Gray* does not clearly establish law, of course.  See *Anderson v. Romero*, 72 F.3d 518, 525 (7th Cir. 1995) (holding that district court decisions do not clearly establish constitutional rights).  But *Gray* accurately described the law in the Seventh Circuit back in 2000.  *Campbell*, *Mary Beth G.*, *Renfrow*, and other Seventh Circuit cases cited in *Gray* established the narrow circumstances where warrantless strip-searches *may* be permissible:  incident to an arrest, at an

international border, or at a school.  None of those circumstances were present when Officer Jackson strip-searched these plaintiffs on Sergeant Royce's orders.

Cases with facts identical to this case are probably uncommon.  One hopes that any reasonable police officer would know that a warrantless strip-search of three people who were not under arrest was unreasonable.  Aside from *Gray*, the parties have identified no cases in this circuit (other than border or school cases) where individuals were strip-searched without a warrant or being placed under arrest.  This lack of cases is telling.  Officers likely refrain from such conduct because it is clear that the conduct violates the Fourth Amendment.  Sergeant Royce is not entitled to qualified immunity for the strip-search claims.

E.    *State Law Claims*

1.    *State Constitutional Claims*

Plaintiffs have withdrawn their claims under the Indiana Constitution.  First Am. Compl. ¶¶ 123, 124; see Dkt. No. 121 at 9.

2.    *State Tort Immunity*

Sergeant Royce argues that the Indiana Tort Claims Act gives him personal immunity against plaintiffs' state law claims.  Plaintiffs appear to concede that they cannot assert their state law claims against Royce personally, though they can attempt to hold the City of Madison liable for Royce's torts.  Dkt. No. 151 at 23-24.  This concession is called into doubt because plaintiffs argue that Royce is liable for assault, battery, sexual harassment, intentional infliction of emotional distress, and wrongful infliction of emotional distress under state and federal law. Dkt. No. 151 at 20-22.  The court's best reading of plaintiffs' brief is that they believe they can recover for these five torts against the City of Madison, not against Royce directly.

This interpretation is consistent with the Indiana Tort Claims Act prohibition of tort suits against government employees personally for conduct within the scope of employment.  Indiana Code § 34-13-3-5(b) provides in part: "A lawsuit alleging that an employee acted within the scope of the employee's employment bars an action by the claimant against the employee personally." Plaintiffs admit that the torts pled against Royce are based on acts that were within the scope of his employment.  See First Am. Compl. ¶ 10; Dkt. No. 151 at 23-24.  Royce is not liable personally for state law torts, no matter how egregious they might have been.  See *Bushong v. Williamson*, 790 N.E.2d 467, 471-73 (Ind. 2003) (employees are not liable for acts performed within the scope of their

employment even if acts were criminal).  Plaintiffs cannot sue Royce personally for state torts, but they may be able to hold the City of Madison liable for any state torts that Royce committed.

      F.    *New Federal Causes of Action*

Plaintiffs suggest in their response brief that they can pursue federal claims of assault, battery, sexual harassment, intentional infliction of emotional distress, wrongful infliction of emotional distress, and malicious prosecution against Royce personally.  Dkt. No. 151 at 20-22.  As Royce points out, plaintiffs did not include these claims in their complaint as federal claims (they included them as state law claims), and they may not amend their complaint through a summary judgment brief.  Plaintiffs argue that they pled these torts as federal claims because the complaint "reallege[s] and incorporate[s] by reference all previous paragraphs," which include their state claims, at the beginning of the section listing the federal causes of action.  First Am. Compl. ¶ 126. This paragraph cannot be interpreted to include every previous cause of action (including, for instance, causes of action under the Indiana Constitution) as federal causes of action.  Plaintiffs may allege that conduct that gave rise to these causes of action is relevant in determining whether the searches were lawful and in determining damages, but they cannot bring these new claims as separate claims.  There is no general federal law of torts that plaintiffs can rely upon here.  Plaintiffs' federal claims are limited to alleged violations of their federal *constitutional* rights.

G.    *Conclusion*

Sergeant Royce's motion for summary judgment is granted on the federal Fourth Amendment seizure claims, the search of the car, the pat-down search of Lessley, and individual liability for state law torts. His motion is denied on the federal claims of unreasonable search for the pat-downs of Messer and Rhodehamel and the strip-searches of all plaintiffs.

II.    *Other Police Officers' Motion for Summary Judgment*

Officers Jackson, Simpson, Strouse, and Watterson have moved for summary judgment on several claims.  Their motion raises many of the same arguments as Royce's motion.  Like Royce, the officers are not individually liable for plaintiffs' state law claims.  Only the City of Madison may be liable for the officers' alleged torts.  Unless otherwise noted, the court addresses the federal claims.

A.    *Seizures*

As discussed above, the traffic stop was permissible and the subsequent seizure of the plaintiffs was permissible.  The officers are entitled to summary judgment on the seizure claims.

B.    *Searches*

The search of Rhodehamel's car and its contents was reasonable.  The pat-down search of Lessley was also reasonable.   The other searches were unreasonable.

1.    *"Search Incident to Probable Cause to Arrest"*

The officers argue that the searches of the plaintiffs were reasonable because they were searches "incident to probable cause to arrest."  That is, the officers argue that they could search the plaintiffs because there was probable cause to arrest them, regardless of whether there was probable cause that a search would reveal evidence, and regardless of whether they actually arrested the plaintiffs.  The officers do not specify whether they are referring to the pat-down searches or the strip-searches.  The court construes the officers' argument broadly and assumes that they seek summary judgment for both the pat-downs and the strip-searches.   The court declines defendants' invitation to create a new justification for warrantless searches.  Warrantless searches performed incident to probable cause to arrest, when there is no arrest or when the only arrest is justified later by the fruits of the search, are not presumptively reasonable.

A search incident to arrest may precede an arrest, but the arrest must follow the search quickly.  *Rawlings v. Kentucky*, 448 U.S. 98, 111 (1980); *United States v. Willis*, 37 F.3d 313, 318 (7th Cir. 1994) ("A search incident to arrest must

be contemporaneous with that arrest to be valid."). A search cannot be justified as "incident to arrest" when the results of the search are used to justify a later arrest. *Sibron v. New York*, 392 U.S. 40, 63 (1968). The circumstances of this case show that the officers' justification for the arrest of Lessley was the marijuana discovered during the strip-search. The searches of her cannot be justified as incident to her later arrest.

Though the court does not adopt the point, there is some support for the proposition that officers may pat-down an individual based on probable cause to arrest if the officers have a reasonable belief that the search will reveal evidence and that the individual will destroy the evidence. See Wayne R. LaFave, 3 Search and Seizure § 5.4(b) at 194-96 (4th ed. 2004); *United States v. Banshee*, 91 F.3d 99 (11th Cir. 1996); *State v. Smith*, 593 A.2d 210 (Me. 1991). This proposition does not apply to much more invasive strip-searches. It is also based on the assumption that the individual was ultimately arrested. In this case, two of the plaintiffs (the two whose pat-down claims survive) were never arrested, and the officers had no probable cause to search them. The court is aware of no case approving a search where a person who was *never* arrested was searched just because he *could have been* arrested. The court also is aware of no case upholding a search as incident to an arrest where the fruits of the search were the sole basis for the arrest. Finally, the court is aware of no case upholding a strip-search of a person because officers had probable cause to arrest, but not search, the person. Absent such authority, *Rawlings* and *Sibron* control this case. At a

minimum, the officers needed probable cause that the searches would reveal evidence, not just probable cause to arrest the plaintiffs. Neither the pat-down searches of Messer and Rhodehamel nor the strip-searches were justified as searches "incident to probable cause to arrest."

### 2. *Reasonableness of the Strip-Searches*

The officers argue that any searches supported by probable cause were not performed in an unreasonable manner. The argument has no effect on the warrantless strip-searches that were not supported by probable cause. No matter how cautiously the officers might have performed the searches, they needed probable cause. Plaintiffs do not argue that the searches that were supported by probable cause (search of the car and contents and pat-down of Lessley) were performed in an unreasonable manner.[12]

### C. *Qualified Immunity*

Simpson, Strouse, and Watterson are not entitled to qualified immunity for the pat-downs of Messer and Rhodehamel and the strip-searches. The court's discussion of Royce's qualified immunity arguments applies to these officers. One additional point merits discussion. It is clearly established that a search incident to arrest requires an actual arrest. See *Rawlings v. Kentucky*, 448 U.S. 98, 111

---

[12]These police officers have not raised any issue about their personal responsibility for the strip-searches, except Jackson's qualified immunity argument discussed next.

(1980); *United States v. Willis*, 37 F.3d 313, 318 (7th Cir. 1994) ("A search incident to arrest must be contemporaneous with that arrest to be valid.").

Officer Jackson argues that she is entitled to qualified immunity for the unreasonable strip-search claim because Sergeant Royce told her that the plaintiffs consented to a search.[13]  In her incident report, Jackson stated that Royce had told her that the plaintiffs agreed to a "further search of their person." Dkt. No. 130, Tab 8, Ex. 45.  Jackson testified that Royce told her that the plaintiffs had agreed to "the search."  Jackson Dep. 44.  Royce testified that he told Jackson that the plaintiffs had consented to "a more thorough search."  Royce Dep. 109.  Plaintiffs do not dispute that Royce told Jackson that they consented to a more thorough search, but they argue that she had a duty to obtain consent personally.[14]

A warrantless search performed without probable cause is reasonable if the person searched provides valid consent.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973).  Neither side has directed the court to a case where an officer relied on another officer's claim of consent and was held liable for a search, and the

---

[13]The argument that Jackson cannot be liable because Royce told her that the plaintiffs consented seems to be a merits argument, but Jackson briefed it as a qualified immunity argument.

[14]Plaintiffs also argue that Jackson had a duty to advise them of their *Miranda* rights.  Jackson's failure to advise the plaintiffs of their *Miranda* rights does not nullify the consent she received because *Miranda* applies only to interrogations, not physical searches.  See *United States v. McClellan*, 165 F.3d 535, 544-45 (7th Cir. 1999).

court has found no such authority.  Courts are faced with a similar situation when officers apply for search warrants based on information from other officers. In that situation, an officer is entitled to rely on information from another officer. See *United States v. Ventresca*, 380 U.S. 102, 111 (1965).  That principle applies to this situation.  In any event, absent any cases even suggesting that an officer cannot rely on another officer's report of consent, Jackson did not violate a clearly established right.  She is entitled to summary judgment on the strip-search claims against her.

      D.    *State Law Claims*

Plaintiffs' state law claims against the officers must be made against the City of Madison.  The officers' arguments that Indiana's law enforcement immunity and the existence of probable cause to seize the plaintiffs bar all state law claims are moot.

E.    *Conclusion*

The officers' motion for summary judgment is granted on the federal Fourth Amendment seizure claims for all plaintiffs, the claims for the search of the car, the unreasonable pat-down of Lessley, and individual liability for state law claims. Jackson is entitled to summary judgment on the unreasonable strip-search claims. The motion is denied on the federal claims of unreasonable search for the pat-downs of Messer and Rhodehamel and the strip-searches of all plaintiffs (for all moving defendants except Jackson).

III.    *Madison and Supervisory City Officials' Motion for Summary Judgment*

Former Madison mayor Albert Huntington, councilman Jim Lee, former city attorney Robert Barlow, former Madison Police Chief Robert Wolf (the supervisory defendants) and the City of Madison have moved for summary judgment. Plaintiffs bring several claims against these defendants. They claim that Madison is liable as a municipality for having a policy or custom that caused the officers to violate the plaintiffs' constitutional rights.[15] They claim that Madison is liable for the officers' state law torts. They claim that the supervisory defendants caused their constitutional rights to be violated and defamed them. Summary judgment is granted on any claim against the supervisory defendants personally, on the

---

[15]They also claim that Madison, Huntington, Barlow, and Wolf obstructed justice and breached their duty to preserve evidence. First Am. Compl. ¶ 135. No party addresses this claim, so the court does not address this claim.

defamation claim, and on some state claims.  Summary judgment is denied on the municipal liability claim and some state claims.

A.   *Supplemental Facts*

The facts designated above are still operative.   Some additional facts concerning Madison are necessary.[16]

1.   *Madison Procedures*

The Madison Police Department had several relevant policies in effect at the time of the search.  None of the written policies concerned warrantless searches. Madison provided its officers with "Consent to Search" forms.  Standard Operating Procedure 17 concerned the transporting of prisoners.  It provided that same-sex officers may perform a "full search" after an arrest and opposite-sex officers may perform a more limited pat-down.   Dkt. No. 112, Tab 14.   It prohibited communication with a prisoner during her transportation unless the prisoner had

_____

[16]Several defendants (including Madison) moved to strike as evidence plaintiffs' designation of Royce's and Simpson's personnel files and a statement by Shirley Rogers.  Dkt. No. 153.  That motion is denied.  Defendants cited several cases that rely on Federal Rule of Evidence 404(b) to exclude evidence of prior bad acts.  Rule 404(b) applies only when evidence is offered to show character and conformity with character.   Plaintiffs have designated this evidence to show a municipal policy or custom.  Evidence of past acts of officers is admissible to show a municipal custom, and it is often necessary to make such a showing.   See *Cornfield v. Consolidated High School Dist. No. 230*, 991 F.2d 1316, 1326 (7th Cir. 1993).

signed a waiver of rights form.  After the events of this case, Madison adopted a new procedure for warrantless searches, Standard Operating Procedure 35.  *Id.* At the time of the searches, Madison did have an unwritten, understood policy for strip-searches that prohibited officers from strip-searching individuals of the opposite sex.  Wolf Dep. 10-11.  Madison provided officers with no training specific to strip-searches.  Wolf Dep. 11.

### 2.    *Similar Incidents*

Officer Jackson has conducted three other pre-arrest strip-searches. Jackson conducted the first search in the restroom of a local restaurant.  Jackson Dep. 16-17.  She was working for another local police department at the time. Jackson Dep. 17.  She conducted the search of a female after Sergeant Royce and Officer Simpson pulled the female over.   Jackson Dep. 17-18.   Simpson had patted-down the female and was pricked by a needle.  Simpson Dep. 20.  Royce or Simpson then called the county dispatch for a female officer to perform the strip-search.  Jackson found a spoon with cocaine residue.  Jackson Dep. 16.

Jackson performed another strip-search at a restaurant in Madison. Jackson and Strouse, who was also involved with that search, disagree on whether the search occurred before or after January 2007.  See Jackson Dep. 19 (after February 2007); Strouse Dep. 15 (probably before January 2007).  Jackson performed the search after an Indiana State Police trooper called her to the scene

of a traffic stop.   Jackson Dep. 20.   She performed the search in a locked bathroom at the restaurant.  Strouse Dep. 15.  Jackson struggled with the female during the search, but Jackson eventually discovered cocaine on the female. Jackson Dep. 20, 23-24; Strouse Dep. 15.

Jackson conducted a third strip-search.  It is unclear if the search was performed before or after January 2007.  The Indiana State Police had a search warrant for a home, and they suspected that the occupant was hiding drugs on her body.   Jackson Dep. 22.   They called Jackson, who was working for the Madison Police Department at the time, and she strip-searched the woman in her bathroom.  *Id.*  Jackson did not find contraband on the woman.  Jackson Dep. 23. The record does not establish that any of these strip-searches were illegal.

### 3.   *Officer Misconduct and Investigations*

Plaintiffs designated a substantial amount of evidence suggesting that the officers involved in this case, particularly Royce and Simpson, engaged in several incidents of misconduct and were not disciplined adequately by Chief Wolf and other Madison officials.  Viewed through the generous lens of summary judgment, the evidence suggests serious misconduct towards women by Royce.   It also suggests that Royce was not careful in executing warrants, which led him to arrest individuals in error.  The court discusses the most pertinent pieces of evidence.

In 2003, Royce forcibly patted down a young man for no apparent reason and ridiculed the young man after the search. Dkt. No. 130, Tab 7. In 2004, two women complained that Royce was rude to them and mistakenly tried to serve a warrant against them that was directed at an individual not in their home. *Id.* Chief Wolf concluded that Royce acted inappropriately, but he did not impose discipline. In 2005, a Madison resident complained that Royce was making advances toward her daughter. Plaintiffs' brief suggests that the daughter was in junior high school, but the record is unclear on the daughter's age. *Id.* In 2005, Royce arrested a woman on a search warrant that was directed toward another woman. *Id.* Chief Wolf had a discussion with Royce after the incident. A similar incident, which also involved Simpson, occurred in 2006. *Id.* In late 2005 and early 2006, Royce was disciplined for appearing at his wife's home (they were separated) late at night and peeking in the windows. Dkt. No. 116, Tab 11; Dkt. No. 130, Tab 7. In 2006, a nineteen-year old female reported that Royce was being "disrespectful" to her at her apartment and threatened to arrest her for no reason. Dkt. No. 130, Tab 7. Around the same time, a woman claimed that Royce harassed her and made obscene signals to her after she refused to date him. *Id.* Finally, in April 2007, Wolf received a report that in 2005 Royce stuck his hand inside the pants (touching the underwear and skin) of a sixteen-year old female. Dkt. No. 116, Tab 13. The Jefferson County prosecutor investigated these last allegations, but he has not filed charges against Royce for the conduct. Royce was suspended for three days. Wolf Dep. 126. Plaintiffs argue that Chief Wolf repeatedly failed to impose adequate discipline on Royce for his conduct. In 2006

Wolf determined that Simpson was "socializing with known drug users and dealers." Dkt. No. 130, Tab 7. This included having a sexual relationship with a woman involved in illegal drug activity. *Id.*

### 4.    *Investigation and Statements to the Public*

Chief Wolf investigated the January 19 stop and searches. Wolf Dep. 35-40. He spoke with the officers and reviewed their reports. Wolf Dep. 35-40, 60. The information available suggested to Wolf that the plaintiffs consented to the searches. Wolf Dep. 40-41. Wolf conveyed the results of his investigation to Mayor Huntington. Huntington Dep. 64-65, 100-01. Wolf also told Huntington that the plaintiffs did not sign a "Consent to Search" form, Huntington Dep. 64-66, and Huntington knew that Madison police officers had been "advised" to obtain written consent before performing strip-searches, Huntington Dep. 96.

After plaintiffs filed the initial complaint in this case, Huntington delivered a statement about the case to the Madison City Council on September 18, 2007. Huntington Dep. 89-90. Huntington prepared the statement, and city attorney Barlow reviewed it. *Id.* It read in part:

> The allegations in the complaint have been investigated in the past and are in the process of being further investigated.
>
> . . .
>
> While Indiana Law does not permit police officers to require individuals to submit to a strip search under the circumstances alleged in the complaint,

the Plaintiffs each consented to a further search of her clothing before the marijuana was found concealed in the clothing of one of the Plaintiffs.

. . .

The second set of allegations with respect to the Plaintiffs' complaint concerns an alleged cover up of police misconduct which the City of Madison emphatically denies occurred.  Plaintiffs' counsel has requested several documents and reports from the City and has been provided documents responsive to the requests, including documents regarding an allegation against a police officer in 2004 and not involving the Plaintiffs' lawsuit.  The City of Madison has complied with the Indiana Public Records Law regarding the public document request.

. . .

I want to point out that every police officer for the City of Madison is trained at the Indiana Law Enforcement Academy and through continuing education to deal with a wide variety of circumstances that may occur while in the line of duty.  It is my expectation that every individual coming into contact with any Madison police officer will be treated with respect and courtesy.

Dkt. No. 122, Tab 2.

In a follow-up interview with a *Louisville Courier-Journal* reporter, Barlow suggested that the search was only of the plaintiffs' clothing.  Dkt. No. 122, Tab 3.  On October 2, 2007, Barlow made the following statement to the City Council:

[T]he search involved each of the individuals having their undergarments searched.  It should be noted that each of the women, all of whom were over eighteen years of age at the time, consented to the search.  It should be further noted that the search of one of the females revealed the presence of marijuana on her person.

The complaint also contains allegations that the police officers and Chief Wolf, and the Board of Works, have in some fashion tried to cover up this situation and other conduct.  Nothing could be further from the truth.

It is important to note that it was . . . in mid-May of this year that the first information regarding a complaint arising from the January search reached City of Madison personnel.

. . .

At no time during this sequence of events, nor thereafter, have any activities been covered up in any fashion.

Dkt. No. 122, Tab 2.

B.      *Municipal Liability*

The City of Madison can be liable under 42 U.S.C. § 1983 only if one or more of its officers actually violated plaintiffs' constitutional rights and the violations were caused by a city custom or policy.  See *Monell v. Department of Social Services*, 436 U.S. 658, 694-95 (1978); *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 765 (7th Cir. 2006).  A custom or policy is necessary because Madison cannot be liable under section 1983 solely for the actions of its employees under a *respondeat superior* theory.  *Monell*, 436 U.S. at 691.  When, as here, liability is based on an alleged custom rather than an official policy, plaintiffs must show that the city has "a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law."  *Roach v. City of Evansville*, 111 F.3d 544, 548 (7th Cir. 1997).  The custom must be the "moving force" behind the alleged constitutional deprivation.  *Monell*, 436 U.S. at 691-94.

Plaintiffs advance no clear legal theory explaining why a Madison custom caused the officers' constitutional violations, though they appear to argue that Madison's custom manifested itself through failure to train and supervise its officers despite repeated claims of officer misbehavior.  To show a custom, the plaintiffs must show that Madison's failure to train or supervise its officers amounted to "deliberate indifference" to the constitutional rights of Madison residents.  See *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1029 (7th Cir. 2006).  They can show this by offering evidence of "failure to provide adequate training in light of foreseeable consequences" or "failure to act in response to repeated complaints of constitutional violations by [Madison's] officers."  *Id.* at 1029-30.

The question is close on the current record of evidence, but the court concludes that plaintiffs have offered enough evidence to permit a reasonable jury to conclude that the City of Madison's failure to take appropriate corrective action in response to repeated complaints of Royce's mistreatment of civilians, particularly women, could have amounted to an unconstitutional custom.  The record includes reports that could permit a jury to conclude that the city had been informed that Royce twice made inappropriate advances toward girls under eighteen.  The record includes reports that could permit a jury to conclude that Royce (once with Simpson) falsely arrested women twice.  A report suggests that Royce illegally patted down a young man.  Another report suggests that Royce harassed and made obscene gestures toward a woman who refused to date him.

Even more troubling was the report Chief Wolf received that Royce had stuck his hand inside the pants (touching the underwear and skin) of a sixteen-year old female.  Dkt. No. 116, Tab 13.

The court stresses that these items reflect the plaintiffs' version of the facts, but a jury could hear these facts and conclude that Royce exhibited a pattern of mistreatment toward civilians, especially women, that rose to the level of unconstitutional conduct.  A jury could also conclude that Royce received little corrective discipline from the City of Madison.  At the summary judgment stage, plaintiffs have come forward with some evidence that the City of Madison had a custom of permitting its officers to mistreat civilians, particularly women.  See *Woodward v. Correctional Medical Services of Illinois, Inc.*, 368 F.3d 917, 927 (7th Cir. 2004), quoting *Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 531 (7th Cir. 2000) ("Municipal liability can . . . be demonstrated indirectly 'by showing a series of bad acts and inviting the court to infer from them that the policymaking level of government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned, thus in either event adopting, the misconduct of subordinate officers.'").[17]

---

[17]After the summary judgment motions were briefed, the city produced a substantial additional volume of relevant material after the magistrate judge ordered it to do so.  That additional evidence, which plaintiffs have submitted but not yet briefed, removes any doubts the court might have had about denying summary judgment on this claim.  The court therefore will not order further briefing on the *Monell* claim.

Plaintiffs must show a "causal nexus" between a City of Madison custom of permitting its officers to mistreat civilians and the constitutional violations alleged in this case. *Palmquist v. Selvik*, 111 F.3d 1332, 1345 (7th Cir. 1997). A jury could find such a nexus. The plaintiffs are three young women who allege that the defendant officers violated their constitutional rights by subjecting them to illegal searches, including strip-searches. If the City of Madison had responded adequately to the multiple complaints against Sergeant Royce, a reasonable jury could conclude, the allegedly illegal searches in this case would not have occurred. Madison is a small community with a small police force. Condoning even one officer's repeated mistreatment of civilians in similar manners easily could have spoken volumes to other officers by suggesting that the type of abuse of police authority alleged here would be tolerated by city leaders. The city is not entitled to summary judgment on the municipal liability claim under 42 U.S.C. § 1983.

C.    *Personal Liability of the Supervisory Defendants*

The supervisory defendants argue that they are not personally liable for plaintiffs' claims because they did not participate personally in the events of January 19, 2007.  The court agrees.

The court discussed the standard for a supervisor's section 1983 liability above. The basic principle is that section 1983 liability requires personal responsibility.  42 U.S.C. § 1983 ("Every person who . . .  causes to be subjected any . . . person . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . ."); *Rascon v. Hardiman*, 803 F.2d 269, 273 (7th Cir. 1986).  However, "supervisory liability can be established if the conduct causing the constitutional deprivation occurs at the supervisor's direction or with the supervisor's knowledge and consent."  *Nanda v. Moss*, 412 F.3d 836, 842 (7th Cir. 2005).

The supervisory defendants were not personally involved in the events of January 19, 2007.  There is a difference between supervisory liability and municipal liability for failure to train or supervise.  While a municipality may be liable because of its acts or omissions, a supervisor must have personally caused the specific constitutional violation.  This requires, at least, knowledge of the specific conduct challenged and acquiescence to the conduct.  See *Lanigan v. Village of East Hazel Crest*, 110 F.3d 467, 478 (7th Cir. 1997) (police chief not

liable when officer used excessive force because he did not know that officer was using excessive force in this instance and he did not have a realistic opportunity to stop the force).   Plaintiffs have designated no evidence showing that the supervisory defendants had any knowledge of these specific searches, let alone knowledge of previous unconstitutional searches.   Plaintiffs argue that the supervisory defendants are liable for the same reason that Madison is liable: because they failed to respond to the officers' earlier pattern of misconduct. However, "to be liable for the conduct of subordinates, a supervisor must be personally involved in that conduct." *Id.* at 477.  The supervisory defendants are entitled to summary judgment on any claim seeking to hold them responsible personally for the events of January 19, 2007.[18]

### D.    *Defamation*

Madison, Huntington, and Barlow argue that they are not liable for their public statements about the searches.[19]  They argue that summary judgment is appropriate for three reasons:  the statements were privileged, the statements did not rise to the level of defamation, and the statements were not made with malice.

---

[18]To the extent plaintiffs allege that the supervisory defendants are liable in their official capacity, their claim is against the City of Madison.  *Walker v. Sheahan*, 526 F.3d 973, 977 (7th Cir. 2008) ("Actions against individual defendants in their official capacities are treated as suits brought against the government entity itself.").

[19]It is unclear which parties request summary judgment, particularly in light of the Indiana Tort Claims Act's personal immunity provisions.  The distinction is unimportant, however, because the statements cannot be the basis for a defamation action.

The court need only address the second argument because the statements did not rise to the level of defamation.

Indiana recognizes two types of defamation:  defamation *per se* and defamation *per quod*.  To recover on a claim of defamation *per se* or *per quod*, plaintiffs must prove (1) defamatory imputation; (2) malice; (3) publication; and (4) damages.  *Kelley v. Tanoos*, 865 N.E.2d 593, 596-97 (Ind. 2007).  A defamatory statement must also be false.  *Trail v. Boys & Girls Clubs of Northwest Indiana*, 845 N.E.2d 130, 136 (Ind. 2006).  "A communication is defamation *per se* if it imputes: (1) criminal conduct; (2) a loathsome disease; (3) misconduct in a person's trade, profession, office, or occupation; or (4) sexual misconduct."  *Kelley*, 865 N.E.2d at 596.  Any other defamatory communication is defamation *per quod*. *Id.*  The difference is that a plaintiff who has shown defamation *per se* enjoys a presumption of damages, while a plaintiff who has shown defamation *per quod* must prove special damages.  *Id.* at 597.

The fatal flaw in plaintiffs' defamation claim is that they suffered no damages.  Plaintiffs argue that the statements were intended to "degrade" them and "impeach their honesty, integrity and reputations" by falsely suggesting that they "were lying about having been strip searched, about not granting legal consent to the searches, about being treated inappropriately, and about the lack of officer training."  Dkt. No. 168 at 3.  They claim that the statements amount to defamation *per se*.

The only portions of Huntington's and Barlow's statements that fit into one of the defamation *per se* categories are the assertions that one of the plaintiffs possessed marijuana, but this is not an actionable statement because it was true. The other statements are not defamation *per se*.[20] The statements may include a "defamatory imputation" to support a claim of defamation *per quod* because they suggest that plaintiffs lied in the civil complaint. See *Kitco, Inc. v. Corporation for General Trade*, 706 N.E.2d 581, 587 (Ind. App. 1999) ("Defamation is that which tends to injure reputation or to diminish esteem, respect, good will, or confidence in the plaintiff, or to excite derogatory feelings or opinions about the plaintiff.").[21] Plaintiffs have not offered evidence that they have suffered any special damages, which are required for defamation *per quod*. Special damages are "damages, generally pecuniary in nature, which are consequential to the defamation." *Rambo v. Cohen*, 587 N.E.2d 140, 146 (Ind. App. 1992). To sustain a defamation claim, the damages must be "incurred as a natural and proximate consequence"

---

[20]Citing *Baker v. Tremco, Inc.*, 890 N.E.2d 73 (Ind. App. 2008), *trans. granted* — N.E.2d —, — (Ind. Feb. 19, 2009), plaintiffs attempt to create a distinction between libel *per se* and slander *per se*. That opinion states that, unlike slander *per se*, libel *per se* may be proven by a showing that the words tend to impeach another's honesty. This conclusion runs contrary to the Indiana Supreme Court's statement in *Kelley* that defamation *per se* (without differentiating between libel and slander) requires a showing that one of the four *per se* categories is satisfied.

[21]Plaintiffs repeatedly assert that the statements suggest that they lied about being strip-searched. This is incorrect. While the statements refer to clothing searches, they also refer to strip-searches. See Dkt. No. 122, Ex. 54 ("While Indiana law does not permit police officers to require individuals to submit to a strip search under the circumstances alleged in the complaint, the Plaintiffs each consented to a further search of her clothing before the marijuana was found concealed in the clothing of one of the Plaintiffs."); Dkt. No. 122, Ex. 77 ("The search involved each of the individuals having their undergarments searched.").

of the communication. *Northern Indiana Public Serv. Co. v. Dabagia*, 721 N.E.2d 294, 304 (Ind. App. 1999), quoting *Stanley v. Kelley*, 422 N.E.2d 663, 669 (Ind. App. 1981). Plaintiffs have pointed to no damages that Huntington's and Barlow's statements caused them. Without a showing of special damages, plaintiffs' defamation claims fail.[22]

E.      *State Law Claims Against Officers*

The City of Madison argues that it is not vicariously liable for plaintiffs' state law claims against the officers.[23] As the court discussed above, the Indiana Tort Claims Act requires that state law claims for the officers' conduct be brought against their municipal employer, the City of Madison. See Ind. Code § 34-13-3-5(b). Madison is entitled to summary judgment on all of plaintiffs' state law claims against the officers except the claims of assault and battery.[24]

1.      *Law Enforcement Immunity*

---

[22]Plaintiffs urge the court to deny the motion for summary judgment because defendants have obstructed discovery of records that may suggest that Huntington and Barlow knew the statements were false when they made them. Dkt. No. 168 at 2 n.1. Summary judgment is appropriate because, even if Huntington and Barlow knew their statements were false, plaintiffs have not shown that they suffered damages.

[23]Madison makes this argument by incorporating Royce's and the other officers' briefs.

[24]Plaintiffs have withdrawn their state law claims for malicious prosecution and abuse of process. Dkt. No. 163.

The Indiana Tort Claims Act provides that "a governmental entity or an employee acting within the scope of the employee's employment is not liable if a loss results from:  . . . the adoption and enforcement of or failure to adopt or enforce a law (including rules and regulations), unless the act of enforcement constitutes false arrest or false imprisonment."   Ind. Code § 34-13-3-3(8). Madison argues that this often-litigated law enforcement immunity provision bars all of plaintiffs' state law claims except for claims of false arrest or false imprisonment.  Plaintiffs' position on this argument is unclear.  In their first motion for summary judgment, plaintiffs state that the court should find that defendants "are not entitled to assert the defense of law enforcement immunity on the state law claims," but they cite no authority, and immediately prior to this statement they appear to admit that only the state law claims of false arrest and false imprisonment can survive the immunity.  Dkt. No. 110 at 77-78.  However, in response to Royce's motion for summary judgment, they appear to argue that their claims against Royce for assault, battery, and sexual harassment are not barred by immunity because they "are not recognized law enforcement activities." Dkt. No. 151 at 21.[25]  The court discusses whether the state law claims of assault and battery are precluded by section 3(8)'s grant of immunity.

Plaintiffs' brief describes their claims as assault, battery, and sexual harassment, but the complaint lists "sexual harass[ment] and assault[]" and

---

[25]Plaintiffs also claim that Royce is liable for wrongful or intentional infliction of emotional distress, but they do not argue that this state claim can survive section 3(8) immunity.  It cannot.

"sexual[] batter[y]."  First Am. Compl. ¶¶ 109, 110.  The court uses the language in the plaintiffs' brief because Indiana does not recognize a specialized tort of sexual assault or sexual battery.  Evidence of sexual motivation or conduct can be aggravating conduct for the long-recognized torts of assault and battery but has not been recognized in Indiana as giving rise to a new tort.  Plaintiffs include a tort claim for "deviate sexual conduct."  First Am. Compl. ¶ 111.  The court is aware of no such civil tort (though Indiana defines certain crimes in this manner).  The facts that allegedly support this claim may be relevant as aggravating conduct for a recognized tort action.

While Indiana's grant of immunity to officers and their employers for the "enforcement of . . . a law" appears clear, courts' interpretations of this provision have not been consistent.  The history of law enforcement immunity in Indiana has been addressed by this court and others.  See, *e.g.*, *Fidler v. City of Indianapolis*, 428 F. Supp. 2d 857, 866-67 (S.D. Ind. 2006); *Patrick v. Miresso*, 848 N.E.2d 1083, 1085-87 (Ind. 2006).  No Indiana state court has addressed the application of section 3(8) to claims that an officer assaulted and battered individuals through a search and assaulted an individual by making inappropriate sexual comments.  However, this court has determined that a municipality does not have immunity for a plaintiffs' assault and battery claims stemming from allegations of excessive police force.  *Fidler*, 428 F. Supp. 2d at 867; see *Rising-Moore v. Wilson*, 2005 WL 1607187, at *12 (S.D. Ind. July 7, 2005).  But see

*Ramusack v. Swanson*, 2005 WL 3359114, at *12 (N.D. Ind. Dec. 9, 2005) (stating that § 3(8) "protects governmental entities from claims based on excessive force").

*Fidler* followed the Indiana Supreme Court's decision in *Kemezy v. Peters*, 622 N.E.2d 1296 (Ind. 1993), which held that a municipality was not immune from excessive force claims against its officers. While *Kemezy* has been called into question on other grounds by later Indiana Supreme Court decisions, the *Kemezy* holding that excessive force claims are outside the scope of law enforcement immunity is directly on point and remains good law today. See *Patrick v. Miresso*, 848 N.E.2d 1083, 1086 (Ind. 2006) (decided after *Fidler* and noting that the cases that call into question *Kemezy* and related cases do not expand law enforcement immunity). The statutory law enforcement immunity does not bar plaintiffs' claims for assault and battery against the City of Madison.

2.    *Battery*

The City of Madison argues that plaintiffs' have designated no evidence showing that the officers committed battery against them.  As the court noted above, the court interprets plaintiffs' claim as one of battery, rather than sexual battery.  Plaintiffs have identified no Indiana court that has recognized sexual battery as a stand-alone tort.  See *Oliver by Hines v. McClung*, 919 F. Supp. 1206, 1219 (N.D. Ind. 1995) ("There is simply no recognized tort action in Indiana for sexual battery . . . .").  At least one Indiana court has analyzed a claim of sexual battery as a claim of battery.  See *Pritchett v. Heil*, 756 N.E.2d 561, 566 (Ind. App. 2001) (reversing denial of summary judgment on other grounds but defining sexual battery based on definition of battery).

A person commits the civil tort of battery if "(a) he acts intending to cause a harmful or offensive contact with the person of the other or third person, or an imminent apprehension of such contact, and (b) a harmful contact with the person of the other directly or indirectly results." *Singh v. Lyday*, 889 N.E.2d 342, 360 (Ind. App. 2008), quoting *Mullins v. Parkview Hospital, Inc.*, 865 N.E.2d 608, 610 (Ind. 2007).  Even a slight touching without consent can be the basis of a battery action.  All plaintiffs contend that they were touched by Royce and Jackson without consent.  They may pursue battery claims against the city based on that conduct.  See *McClung*, 919 F. Supp. at 1220 (strip-search can be basis for battery claim).

3.      *Assault*

Plaintiffs' complaint includes a claim against Royce and Jackson for sexual assault, but, like the sexual battery claim, the court interprets this as a claim for assault.  Just as a touching may be a basis for a battery claim, it also may be a basis for an assault claim.  *Singh*, 889 N.E.2d at 360.

4.      *False Arrest and False Imprisonment*

The City of Madison's next argument is that the state law false arrest and false imprisonment claims are precluded because the officers had probable cause to arrest the plaintiffs.[26]  Probable cause to arrest bars a state claim for false arrest.  *Row v. Holt*, 864 N.E.2d 1011, 1016 (Ind. 2007).  Indiana courts have not included a lack of probable cause as an element of false imprisonment.  However, liability for false imprisonment stems from liability for false arrest, so probable cause for an arrest generally will preclude a false imprisonment claim.  See *id.* at 1016 n.4.  The court has found as a matter of law that the officers had probable cause to arrest the plaintiffs for constructive possession of marijuana.  This conclusion bars their state false arrest and false imprisonment claims.

---

[26]Defendants raise only the probable cause to arrest issue.

-59-

F.      *Claims for Punitive Damages*

The City of Madison and the supervisory defendants argue that plaintiffs cannot seek punitive damages on the federal claims against them.  Plaintiffs agree that Madison cannot be liable for punitive damages.  Punitive damages are available for claims against supervisory defendants in their individual, but not official, capacities, but plaintiffs have no surviving personal capacity claim against the supervisory defendants.  See *Kentucky v. Graham*, 473 U.S. 159, 167 n.13 (1985).  Madison and the supervisory defendants also argue that the Indiana Tort Claims Act bars claims for punitive damages.  See Ind. Code § 34-13-3-4(b) ("A governmental entity or an employee of a governmental entity acting within the scope of employment is not liable for punitive damages.").  Plaintiffs do not contest this latter argument.  Madison and the supervisory defendants are not liable for punitive damages on any claims.

G.      *Conclusion*

The City of Madison's and the supervisory defendants' motion for summary judgment is granted on any claim that the supervisory defendants are personally liable for the officers' alleged wrongs.  Summary judgment is also granted on the defamation claims, any claim for punitive damages against the City of Madison, and all state law claims except assault and battery.  Summary judgment is denied on the municipal liability claim under 42 U.S.C. § 1983.

IV.   *Fire Defendants' Motion for Summary Judgment*

The final group of defendants seeking summary judgment is Clifty Fire Company Number 6 (Clifty), James Hendrick, and Jennifer Hendrick (the fire defendants). They seek summary judgment on all state and federal claims against them. The statement of facts above remains operative, but some additional facts are discussed below as needed. These defendants are entitled to summary judgment on all claims against them.

A.   *Additional Facts*

Clifty is one of six volunteer fire departments in Madison. The six departments compose the Madison Fire Department, which is a city department. Clifty, like each of the departments, entered into a contract with Madison to provide Madison with fire prevention services in exchange for funding. Dkt. No. 119, Tab 2. The Madison Board of Public Works develops standard operating procedures for the volunteer departments. James Hendrick Dep. 37. Madison owns Clifty's building, but there is no written lease. James Hendrick Dep. 33.

Each member of Clifty receives a key to the building. James Hendrick Dep. 29-30. Clifty places no restrictions on the building's use for police matters. James Hendrick Dep. 43-44. At the time of the searches, Clifty had no policy concerning strip-searches, and James Hendrick was unaware of any strip-

searches being performed in the building other than the searches in this case. James Hendrick Dep. 29.

Jennifer Hendrick knew that Jackson was searching the plaintiffs, but she did not think that Jackson was strip-searching them.  Jennifer Hendrick Dep. 63-65.  Jennifer Hendrick did not ask Royce whether he had a warrant or written consent to search the plaintiffs.  Jennifer Hendrick Dep. 74.  She did not see or hear Royce or Jackson ask the plaintiffs for consent.  Jennifer Hendrick Dep. 78-79.  After Jennifer Hendrick returned from guarding the plaintiffs, James Hendrick did not immediately ask her what happened.  James Hendrick Dep. 53.  Later in the day he asked her what happened.  Referring to Royce, she told him that "it's just Jamie being Jamie; something to do with a traffic stop." *Id.*  Jennifer Hendrick also told James Hendrick that Royce wanted a female present.  James Hendrick Dep. 53-54.

> B.   *State Claims*

> 1.   *The Hendricks*

Plaintiffs' state claims against the Hendricks are sexual harassment, assault, intentional infliction of emotional distress, wrongful infliction of emotional distress, invasion of privacy, criminal confinement and false imprisonment, false arrest, unlawful restraint of freedom of movement, and depravation of liberty.  The

Hendricks argue that they did not commit these torts.  Based on the undisputed facts, the court agrees.

As the fire defendants point out:  "There was no physical participation by Jennifer and James in the strip searches of the three plaintiffs or other alleged bad acts toward them."  Dkt. No. 154 at 26.  The extent of Jennifer Hendricks' involvement in the events is that she watched the plaintiffs with Royce while the others were searched by Jackson and she asked them whether they possessed marijuana.  She knew that Jackson was searching the plaintiffs in the bathroom, but she did not know that Jackson was ordering them to remove all of their clothes.[27]   James' involvement was even less; at most, he guarded one of the entrances to the room where the plaintiffs were located.

False imprisonment requires an "unlawful restraint upon one's freedom of movement or the deprivation of one's liberty without consent."  *Earles v. Perkins*, 788 N.E.2d 1260, 1265 (Ind. App. 2003).  As discussed above, probable cause to arrest bars a claim for false imprisonment.  False arrest is similar:  "A defendant may be liable for false arrest when he or she arrests a plaintiff in the absence of probable cause to do so."  *Id.*  Plaintiffs' claims against the Hendricks fail because they have designated no evidence showing that the Hendricks restrained their

---

[27]Despite plaintiffs' claim that it is unbelievable that Jennifer Hendrick did not know that Jackson was strip-searching them, plaintiffs have designated no evidence to establish Jennifer's knowledge of a strip-search.  Speculation is not a substitute for evidence.

freedom of movement or caused such a restraint.  Jennifer Hendrick stood in the room with Royce to ensure that he acted appropriately toward the plaintiffs, and she asked them a few questions.  She did not order them to remain seated or take any similar action to keep them in the room.  James Hendrick had no physical interaction with the plaintiffs.  He guarded a door to make sure that no one entered the room with the plaintiffs; this did not restrain them.  The same analysis applies to plaintiffs' claims of unlawful restraint of freedom of movement, deprivation of liberty, and invasion of privacy.

The claims for sexual harassment, assault, intentional infliction of emotional distress, and wrongful infliction of emotional distress also fail.  As noted above, sexual harassment is a component of the assault and battery torts. Assault occurs when an individual "acts intending to cause an imminent apprehension of a harmful or offensive contact with another person."  *Raess v. Doescher*, 883 N.E.2d 790, 794 (Ind. 2008).  There is no evidence that either of the Hendricks did anything to give the plaintiffs fear of an imminent offensive contact. Intentional and reckless infliction of emotional distress require that an individual engage in extreme and outrageous conduct that intentionally or recklessly causes severe emotional distress to another.  See *Lindsey v. DeGroot*, 898 N.E.2d 1251, 1264 (Ind. App. 2009).  The Hendricks' personal involvement in this case was so limited that plaintiffs cannot show that their conduct satisfies any of the elements of these causes of action.  No Indiana case recognizes "wrongful infliction of emotional distress."  Indiana recognizes negligent infliction of emotional distress

in limited circumstances.  See, *e.g.*, *Shuamber v. Henderson*, 579 N.E.2d 452 (Ind. 1991).  However, the Hendricks cannot be liable for this tort because no evidence suggests that either of them did anything to cause the plaintiffs to suffer any serious emotional distress.  See *id.* at 455-56 (negligent infliction of emotional distress requires a showing of serious emotional trauma that is caused by defendant).

### 2.   *Royce*

Clifty is not liable for Royce's state torts.  Royce was acting at all times as a police officer, not as a volunteer firefighter.  The torts he allegedly committed were not within the scope of his employment with Clifty.  See Ind. Code § 34-13-3-5(b).

### 3.   *Clifty*

The final state claim requiring discussion is the claim that Clifty breached a duty of care to the plaintiffs by permitting its facility to be used for the searches and seizures.  First Am. Compl. ¶ 125.  Clifty seems to misinterpret this state claim as a federal claim.  It cites several cases for the proposition that it is not liable under section 1983 for the use of its premises.  It makes only one reference to plaintiffs' argument that it breached a duty to ensure that its premises were not used for the torts.  Despite the confusion, Clifty has argued generally that it is not

liable for legal wrongs committed on its premises.  The undisputed facts show that Clifty did not breach any duty to the plaintiffs.

Plaintiffs' claim of premises liability against Clifty appears to be based on a negligence theory.  The basic requirements of any negligence claim are a duty owed to the plaintiff by the defendant, the defendant's breach of that duty through conduct below a standard of care, and resulting injury.  *King v. Northeast Security, Inc.*, 790 N.E.2d 474, 484 (Ind. 2003).[28]  It is doubtful that Clifty owed a duty to plaintiffs because it was not foreseeable to any Clifty personnel that the building would be used for officer misconduct.  See *Webb v. Jarvis*, 575 N.E.2d 992, 997 (Ind. 1991) ("Imposition of a duty is limited to those instances where a reasonably foreseeable victim is injured by a reasonably foreseeable harm.").  Even assuming that Clifty did owe such a duty to the plaintiffs, it did not breach that duty by failing to stop police officers from committing torts when the tortious conduct was not obvious.  "The duty, when found to exist, is the duty to exercise reasonable care under the circumstances."  *Carter v. Indianapolis Power & Light Co.*, 837 N.E.2d 509, 515 (Ind. App. 2005), quoting *Stump v. Indiana Equipment Co.*, 601 N.E.2d 398, 402 (Ind. App. 1992).

---

[28]Plaintiffs cite *King* to show that Clifty was negligent when it failed to prevent the torts allegedly committed by the officers in the station.  Dkt. No. 118 at 18.   *King* is easily distinguishable.   *King* dealt with the duty of school authorities to exercise reasonable care and supervision for the safety of children under their control.  Reasonable conduct by school officials toward students is much different from reasonable conduct by owners of premises toward people being investigated by police.

The captain of Clifty at the time of the searches was James Hendrick.  The undisputed evidence shows that he did not know that the officers were committing any torts on the property.  Royce knew what was occurring, but he was acting as a police officer, not as a firefighter.  More fundamental, plaintiffs' argument that a property owner should be liable for failing to stop police officers from performing their duties, at least when their actions are not obviously unlawful, would place landowners in an impossible position.  The argument would even invite small-scale anarchy as it would impose a civil legal duty to interfere with officers performing their duties if it were later determined that they were performing those duties in an unlawful manner.  But it is a crime in Indiana to interfere with police officers engaged in the lawful execution of their duties.   Ind. Code § 35-44-3-3(a)(1).  Clifty did not breach a duty to provide safe premises to the plaintiffs, and it is not liable for negligence.

C.    *Federal Claims*

Plaintiffs allege that the Hendricks are liable for invasion of privacy, false imprisonment, unlawful restraint of freedom, and unreasonable search and seizure.  The Hendricks are not liable under section 1983 because the undisputed facts show they were not personally responsible for any harm suffered by the plaintiffs.[29]

---

[29]The fire defendants argue that the Hendricks were not acting under color of law.  The court need not reach this argument because the Hendricks did not violate the Constitution even if they were acting under color of law.

Again, section 1983 liability requires personal responsibility.  *Rascon v. Hardiman*, 803 F.2d 269, 273 (7th Cir. 1986).  It also requires intentional conduct. *Chicago Housing Authority v. Federal Security, Inc.*, 161 F.3d 485, 488 (7th Cir. 1998).  The Hendricks did not search the plaintiffs or cause them to be searched. The undisputed facts show that they were passive bystanders in the search and seizure of the plaintiffs at the fire station.  Even if they did play a role in the search and seizure, they did not intentionally violate the plaintiffs' civil rights because they knew few details about the situation.  There is no evidence that they knew of the circumstances that gave rise to plaintiffs' constitutional claims.

Plaintiffs cite several distinguishable cases.  *Miller v. Smith*, 220 F.3d 491 (7th Cir. 2000), establishes that a failure to intervene may be the basis for section 1983 liability when an individual fails to act with "a deliberate or reckless disregard of the plaintiff's constitutional rights."  220 F.3d at 495, quoting *Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir. 1982).  In *Miller*, one of the defendants was liable because he allegedly watched another defendant attack the plaintiff.  *Hampton v. Hanrahan*, 600 F.2d 600 (7th Cir. 1979), and *Byrd v. Brishke*, 466 F.2d 6 (7th Cir. 1972), involved similar situations where officers stood by as other officers blatantly violated the plaintiffs' rights.  These cases do not support liability for the Hendricks, who did not witness any events they should have realized amounted to violations of constitutional rights.

Additionally, the Hendricks are not liable for any conspiracy with the officers to violate the plaintiffs' constitutional rights.  A civil conspiracy requires "an express or implied agreement among defendants to deprive plaintiff of his or her constitutional rights."  *Scherer v. Balkema*, 840 F.2d 437, 442 (7th Cir. 1988).  There is no evidence of an agreement between the Hendricks and anyone else to violate the plaintiffs' rights.

D.      *Conclusion*

The fire defendants' motion for summary judgment is granted on all claims against them.

*Plaintiffs' Motions for Summary Judgment*

Plaintiffs have filed four motions for summary judgment.  The motions are separated by issue.  Much of the legal analysis above still applies, and the court will attempt to keep repetition to a minimum.

I.      *Statement of Facts Construed Favorably for Defendants*

When discussing plaintiffs' motions, the court must construe the evidence in the light most favorable to defendants.  The court will mention only facts that are different from previously discussed facts in a way material to plaintiffs' motions.

-69-

For purposes of plaintiffs' motion, the court must assume that during the search of Rhodehamel's car, Simpson found marijuana residue.  Simpson Dep. 68. Royce read *Miranda* rights to Lessley when she was in his car.  Royce Dep. 87-88. Royce read *Miranda* rights to Messer and Rhodehamel, and one of them told him that Lessley possessed marijuana.  Royce Dep. 91-95.  Royce asked Lessley to remove her jacket before he searched it.  Royce Dep. 98.  Eventually, each plaintiff told Royce that she consented to a more thorough search.  Royce Dep. 100, 103-04.  Royce then asked each plaintiff to pull out her pants pockets.  Royce Dep. 105.  Plaintiffs consented orally to a strip-search in front of Jackson and Royce at the fire station.  Jackson Dep. 50, 73.  During the searches of Messer and Rhodehamel, those women told Jackson that Lessley possessed marijuana. Jackson Dep. 51, 53.  After Lessley was arrested, Jackson helped Royce place Lessley in his car so that Royce did not reach across her chest to buckle the seat belt.  Royce Dep. 122-23.  While Royce was transporting Lessley to the police station, he did not make any sexual propositions to her.  Royce Dep. 126-28.

II.      *Plaintiffs' First Motion for Summary Judgment*

Plaintiffs' first motion requests summary judgment on the federal unreasonable strip-search claims and two minor issues.  The plaintiffs' brief refers to the other searches, but the motion itself requests summary judgment only on the strip-search claims.  See Dkt. No. 109 at 1 (moving for summary judgment on the claim based on "the warrantless strip searches of the three young women").

Summary judgment is denied on the strip-search claims and one of the minor issues, and granted on the other minor issue.

A.   *Strip-Searches*

Plaintiffs request that the court find the strip-searches unreasonable as a matter of law.[30]  Plaintiffs argue that the searches were unreasonable because their consents were invalid.  The facts construed favorably for defendants show that the plaintiffs consented and that their consents were valid.

A few points merit initial discussion.  First, plaintiffs point out that the officers' stories about the stop and searches are inconsistent.  These inconsistencies may be an important issue at trial (and were at times important to defendants' motions for summary judgment).  But the inconsistencies are not relevant to this motion where the defendants get the benefit of conflicts in the evidence.  Second, plaintiffs seem to argue that the officers are liable for the searches in part because they did not follow Madison's standard operating procedures or use Madison's prescribed search and *Miranda* forms.  Section 1983 provides a cause of action to redress deprivations of rights "secured by the

---

[30]Royce requests that plaintiffs' statement of certain facts in support of their first motion for summary judgment be stricken because the statement does not comply with Local Rule 56.1(a).  The court agrees that plaintiffs have played fast and loose with the local rules concerning designation of evidence, but it would only delay and confuse this case further to strike plaintiffs' statement of facts.

Constitution and laws" of the United States, not local police policies.  See *Doe v. Burnham*, 6 F.3d 476, 480 (7th Cir. 1993).

Voluntary consent to a search is a well-established exception to the warrant requirement under the Fourth Amendment.   See *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).  Whether consent was voluntary is a question of fact to be determined based on the totality of the circumstances.  *Id.* at 227.  The Seventh Circuit has identified six factors to consider in determining whether consent was voluntary:  "(1) the person's age, intelligence, and education; (2) whether he was advised of his constitutional rights; (3) how long he was detained before he gave his consent; (4) whether his consent was immediate, or was prompted by repeated requests by the authorities; (5) whether any physical coercion was used; and (6) whether the individual was in police custody when he gave his consent."  *United States v. Sandoval-Vasquez*, 435 F.3d 739, 744 (7th Cir. 2006).

These factors suggest that the plaintiffs' alleged consent to the searches could be deemed voluntary.  First, while the plaintiffs were only eighteen, they were of majority age and high-school educated.  Second, Royce informed the plaintiffs of their *Miranda* rights.[31]  Plaintiffs argue that Royce did not advise them

_____

[31]Citing *Pirtle v. State*, 323 N.E.2d 634 (Ind. 1975), plaintiffs argue that their consent was involuntary because the officers did not give them an opportunity to consult counsel before consenting to the searches.   *Pirtle*, which dealt with consent to search given while in custody, is based on federal and state constitutional requirements, but the plaintiffs' federal unreasonable search claim can rely only on violations of federal law.  A decision of the Indiana Supreme Court (continued...)

of their rights properly.  However, while helpful, officers do not need to give *Miranda* warnings before obtaining consent to search.  *United States v. Renken*, 474 F.3d 984, 988 (7th Cir. 2007); see *United States v. Strache*, 202 F.3d 980, 985-86 (7th Cir. 2000) (affirming district court finding that consent was voluntary despite officers' failure to advise criminal defendant of his rights).  While it would have been preferable for Royce to have used the "Consent to Search" form, it was not necessary as a matter of constitutional law.  Third, it is unclear how much time passed between the traffic stop and the various alleged consents, but nothing shows definitively that the detentions were drawn out for an unreasonable amount of time or in a manner designed to induce the plaintiffs to consent.  Fourth, the consents were generally given immediately after they were requested.  Lessley informed Royce that she would consent to a more thorough search only if Messer and Rhodehamel consented, but Royce did not badger Lessley into consenting by seeking consent multiple times.  Fifth, no physical coercion was used.  Finally, even if the plaintiffs were being detained in custody when they consented to the search, "custody is not dispositive so long as the potentially coercive effect of custody was mitigated by the circumstances." *Strache*, 202 F.3d at 986 (affirming district court finding that consent was voluntary when criminal defendant was in

---

[31](...continued)
on questions of federal law is instructive but not binding on this court.  The Seventh Circuit, which is binding on this court on questions of federal law, has held that the federal Constitution does not require officers to give individuals an opportunity to consult counsel before consenting to searches. See *United States v. LaGrone*, 43 F.3d 332, 337 (7th Cir. 1994) (noting that *Pirtle* lays down a rule of state law and is not the correct statement of federal law because "a person in custody has no federal constitutional right to consult with an attorney before consenting to a search of his property").

custody but officers did not badger him or physically pressure him).  The officers did not abuse or threaten to abuse the plaintiffs to obtain consent.

A reasonable jury could conclude that the plaintiffs voluntarily consented to the strip-searches and thus that the strip-searches were reasonable.  Plaintiffs suggest that the requests for consent were unclear and their responses were ambiguous, but these are questions for the jury.[32]

---

[32]Plaintiffs' argument that the state prosecutor's dismissal of the charges against Lessley bars the city and police officers from disputing the issue of voluntary consent to the searches is frivolous.  The city and police officers were not parties to the criminal prosecution and could not control the prosecutor's decisions on such matters.

B.    *Qualified Immunity*

Because the court has determined that a reasonable jury could conclude that the strip-searches were reasonable if consent was given, the court need not reach plaintiffs' argument that the officers are not entitled to qualified immunity for the strip-searches.

C.    *Law Enforcement Immunity*

Plaintiffs ask the court to find as a matter of law that defendants are not entitled to assert the defense of law enforcement immunity for the state false arrest and false imprisonment claims.  The court has granted summary judgment on these claims, so this argument is moot.

D.    *Tort Claim Notices*

Plaintiffs ask for summary judgment on the issue of whether they submitted their Indiana tort claim notices to the City of Madison and Clifty in a timely fashion.  See Ind. Code § 34-13-3-8.  Defendants have not responded.  The undisputed evidence shows that plaintiffs mailed the notices to Madison and Clifty in a timely fashion.

E.   *Conclusion*

Plaintiffs' first motion for summary judgment is granted on the timeliness of their tort claim notices and denied on the strip-search claims and the issue of law enforcement immunity.

III.   *Plaintiffs' Second Motion for Summary Judgment*

Plaintiffs' second motion argues that the City of Madison and the supervisory defendants are liable under section 1983 for the violations of their federal rights.  The court has already determined that the supervisory defendants are entitled to summary judgment, so the plaintiffs' motion is denied as it pertains to the supervisory defendants.  The court has denied the City of Madison's motion on the municipal liability claim.  The court also denies the plaintiffs' motion on the municipal liability claim.  While a jury could conclude that the City of Madison had a custom of permitting its officers to mistreat civilians in similar ways, a jury could also conclude that Madison did not have such a custom.  In addition, municipal liability requires an underlying constitutional violation.   At the summary judgment stage, the court has not found any underlying constitutional violations have been proven as a matter of law.  Those questions are for the jury.

IV.   *Plaintiffs' Third Motion for Summary Judgment*

Plaintiffs' third motion requests summary judgment on the premises liability claim against Clifty and Madison.  The court granted Clifty's motion for summary judgment on this claim.  Plaintiffs assert that the claim is also against Madison. This is inconsistent with the complaint, which only makes this claim against Clifty.   First Am. Compl. ¶ 125.   In any event, if plaintiffs have no claim for premises liability against Clifty, they have no claim for premises liability against Madison for the Clifty building for the same reasons.  Plaintiffs also seek summary judgment on the issue of whether the Hendricks are entitled to assert the defense of assisting an officer pursuant to Indiana Code § 35-44-3-7.  Because the court granted summary judgment to the Hendricks, this issue is moot.  Plaintiffs' third motion for summary judgment is denied.

V.   *Plaintiffs' Fourth Motion for Summary Judgment*

Plaintiffs' fourth motion seeks summary judgment on the issue of Huntington's and Barlow's privilege to make the allegedly defamatory statements. The court has granted on other grounds Huntington's and Barlow's motion for summary judgment on the defamation claim, so plaintiffs' motion for summary judgment is denied as moot.

*Appeals of Magistrate Judge's Orders*

Plaintiffs filed a motion to remove the "confidential" designation that Madison placed on 900 pages of police misconduct records that it produced on December 5, 2008.  Dkt. No. 194.  Magistrate Judge Hussmann granted this motion, but he placed three conditions on the removal of the confidential designation:  the records must be redacted as required by Federal Rule of Civil Procedure 5.2; all references to an officer's home address or telephone number must be removed; the names, addresses, and telephone numbers of any person who filed a complaint must be removed if the person made the complaint based on a policy or regulation permitting anonymous complaints.  Dkt. No. 225.[33]

Several defendants have appealed.  Dkt. No. 229.  The court can modify or vacate the magistrate judge's order if it is "clearly erroneous or is contrary to law." Fed. R. Civ. P. 72(a).

_____

[33]It is unclear whether the order unseals misconduct records of all Madison officers or only the defendant officers.  Compare Dkt. No. 225 at 1 ("Plaintiffs seek the unsealing of the 'confidential' disciplinary records of defendant police officers.") with *id.* at 8 (referring to "the disciplinary records").  The court believes that plaintiffs' original motion and the sealed brief incorporating the sealed records make clear that the misconduct records cover defendant and non-defendant officers.  Absent clear language to the contrary, the court interprets Judge Hussmann's order as granting plaintiffs' original motion regardless of whether the misconduct records refer to defendant or non-defendant officers.

Defendants also suggest that plaintiffs' request would lead to unsealing entire personnel records, rather than merely misconduct records.  Plaintiffs' original motion and the magistrate judge's order are clear that only misconduct or disciplinary records are being unsealed.  If plaintiffs wish to unseal currently sealed records that do not relate to misconduct, they must file a separate motion.

Rule 26 permits courts to issue a protective order for "good cause" to "protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1).  The Seventh Circuit has established that the public has a strong interest in having access to court documents.  See *Hicklin Engineering, L.C. v. Bartell*, 439 F.3d 346, 348 (7th Cir. 2006); *Citizens First Nat'l Bank v. Cincinnati Ins. Co.*, 178 F.3d 943, 945 (7th Cir. 1999).  While there is a presumption that discovery materials should be publicly available, the public's interest is not fully matured during pre-trial discovery.  See *Citizens First*, 178 F.3d at 945-46.  As a case moves to summary judgment and trial, "the public interest in access to the evidence takes on much greater weight."  *Rochlin v. Cincinnati Ins. Co.*, 2006 WL 897894, at *1 (S.D. Ind. Apr. 5, 2006).

The magistrate judge's order was not clearly erroneous.  The magistrate judge acknowledged the strong public interest in court documents, particularly documents that relate to public matters.  He noted correctly that Indiana law does not clearly forbid the disclosure of these records.[34]  The court agrees that the misconduct of Madison police officers is relevant to this case and is a matter of public importance.  To accommodate the officers' privacy interests, the magistrate

---

[34] Defendants argue that the magistrate judge's reliance on *Bond v. Utreras*, 2007 WL 2003085 (N.D. Ill. July 2, 2007), was misplaced.  The court disagrees. *Bond* establishes that the public has a strong interest in police misconduct records.  To the extent that *Bond* discusses an Illinois public records law that is different from Indiana's public records law, the differences are insignificant and do not limit *Bond's* relevance to this case.

judge imposed reasonable restrictions on disclosure of the records. Defendants'
appeal is denied.

Plaintiffs' original motion also requested that Docket Number 193 be
unsealed. The magistrate judge's order does not appear to address this issue.
Plaintiffs filed a motion for clarification to determine whether the order unsealed
Docket Number 193, and the magistrate judge denied that request pending this
court's resolution of this appeal. Dkt. No. 232. The court interprets the
magistrate judge's order as not ordering Docket Number 193 to be unsealed.
Plaintiffs may file a separate motion to unseal that document.

Defendants also appealed Judge Hussmann's grant of the plaintiffs' third
motion to compel. Dkt. No. 221. The court has reviewed the disputed document
*in camera* and finds that the contents of the document fall squarely within Rule
26(b)(3)'s broad protections for "mental impressions, conclusions, opinions, or
legal theories of a party's attorney or other representative concerning the
litigation." Defendants' alleged failure to produce this document in a privilege log
in a timely fashion does not act to waive their ability to keep this letter from the
plaintiffs. Plaintiffs have presented no evidence, aside from arguments in a brief,
establishing that the document was disclosed to third parties in a manner that

caused a waiver of privilege.  The magistrate judge's order on this document is contrary to law and is reversed.[35]

*Motion to Amend Complaint*

Plaintiffs seek to file a second amended complaint to add Travelers/St. Paul Fire and Marine Insurance Company as a defendant.  Dkt. No. 124.  Plaintiffs claim that Travelers conspired with Madison to develop a litigation strategy that makes it appear that Royce was the officer most responsible for the searches and seizures.  Plaintiffs also claim that Travelers conspired with Madison to create conflicts of interest in defendants' representation so that any verdict entered against any defendant is subject to reversal on appeal.  Plaintiffs assert these claims under section 1983 and the Fourth and Fourteenth Amendments.

Plaintiffs need the permission of the court to file this amended complaint, but the court should "freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  While Rule 15 gives the court discretion to permit amended complaints, this amendment is inappropriate because the nature of the new claims would make them very difficult to try with the current claims.

---

[35]Defendants' motion to strike plaintiffs' opposition to the appeal of the magistrate judge's order is denied.  Dkt. No. 223.  Rule 72's plain language does not prohibit parties from filing oppositions to appeals of magistrate judges' orders, and, as in any appeal, basic principles of fairness require an opportunity to be heard.

"Although the rule reflects a liberal attitude towards the amendment of pleadings, courts in their sound discretion may deny a proposed amendment if the moving party has unduly delayed in filing the motion, if the opposing party would suffer undue prejudice, or if the pleading is futile." *Soltys v. Costello*, 520 F.3d 737, 743 (7th Cir. 2008), quoting *Campania Management Co. v. Rooks, Pitts & Poust*, 290 F.3d 843, 848-49 (7th Cir. 2002).

The nature of the new claims would make them very difficult to litigate fairly with the current claims.  If these claims make it to a jury in the same action as the claims that have survived summary judgment, defendants would suffer prejudice and the court and the jury would face a very difficult situation.  The amendment would put the existence of liability insurance squarely in front of the jury.  It would also be difficult to instruct a jury to determine damages on plaintiffs' claim that Madison and Travelers are channeling liability to Royce in the same trial in which the jury determines the underlying liability of Royce and other officers for the searches and seizures.  The court undoubtedly would be forced to admit evidence of Royce's and the other officers' ability to pay damages, which would be prejudicial.  The court also would have to admit extensive evidence of the litigation strategy of the underlying claims, which would also be prejudicial and confusing.  This presents a situation different from *Small v. City of New York*, 274 F. Supp. 2d 271 (E.D.N.Y. 2003), in which the court permitted plaintiffs to allege that officers and a private association covered up police misconduct in the immediate aftermath of the conduct.  In this case, plaintiffs allege a denial of their

rights based on the conduct of the litigation itself.  Perhaps plaintiffs have a viable claim based on the conduct of the litigation, but if so, they should assert it in a separate action.

The claim that Madison and Travelers conspired to make any verdict against any defendant subject to reversal presents similar problems.  The jury would be forced to determine damages based on an appellate court's potential future ruling. Evidence of litigation strategy would also be necessary and prejudicial.  Again, perhaps plaintiffs might have a viable claim here, but it should be raised in a separate action.

*Motion to Open Discovery and Allow Further Summary Judgment Responses*

Arguing that some defendants wrongfully withheld discovery, plaintiffs have filed a motion to re-open discovery and to allow further summary judgment briefing.  Plaintiffs also request attorney fees incurred in completing additional discovery and summary judgment briefing.

Discovery has been unnecessarily difficult in this case.  To date, Magistrate Judge Hussmann has issued six orders compelling discovery and an order of sanctions against defendants City of Madison, Huntington, Wolf, Lee, and Barlow. Plaintiffs claim that they received approximately 3,000 documents on December 5, 2008 in response to the sanctions order and that 2,000 of these documents

should have been produced prior to depositions in April 2008.  They also argue that the documents were necessary to permit them to prepare for depositions and summary judgment briefing that occurred prior to December 2008.

Plaintiffs point to several categories of documents that have been withheld and that were necessary to conduct depositions and to brief summary judgment motions properly.  The documents include:  communications between Huntington, Barlow, Lee, and Wolf suggesting that Barlow had determined in June or July 2007 that the strip-searches of the plaintiffs were unwarranted; evidence that Barlow communicated with (an unspecified) defense counsel during 2008; evidence that Barlow and the Jefferson County prosecutor coordinated public responses to the controversy created by the conduct at issue in this case, contrary to Barlow's and Huntington's statements; evidence that Barlow had contact with Madison's insurance company, Travelers, about arranging separate counsel for Royce; evidence that Barlow communicated with Jennifer Hendrick, contrary to her deposition testimony; evidence that Lee has refused to provide e-mails from a private e-mail account; evidence from Wolf suggesting that Simpson did not find marijuana residue in the plaintiffs' car, that the plaintiffs did not consent to a search, and that Royce did not remove plaintiffs' jackets before searching the jackets; evidence that Wolf concluded that the officers' contradicted themselves and that he communicated his belief to Huntington, Barlow, and Lee; evidence that Barlow and Huntington made public statements contrary to Wolf's findings when they had knowledge of Wolf's findings; and evidence that Wolf interviewed

Jennifer Hendrick after Madison received tort claim notices.  Plaintiffs also argue that some of the recently produced evidence is illegible or otherwise in need of clarification through depositions.

In the first of three replies, plaintiffs discuss additional evidence that should have been produced prior to the depositions but was not produced until December 5, 2008.  This evidence includes:  notes of interviews that Wolf had with the officers, which suggested that Wolf was not truthful in his deposition; 900 pages of Barlow's records suggesting that the searches were illegal; 1,000 pages of personnel records of officers involved in this case; 900 pages of records concerning the misconduct of all Madison police officers; 100 pages of Huntington's records; an additional misconduct record about Royce; evidence about a litigation strategy to isolate Royce from other defendants; evidence suggesting that Madison officials did not follow proper procedure for disciplining officers.  Plaintiffs also argue that defendants continue to withhold evidence including:  police audio dispatch tapes containing discussion of Royce's misconduct; Lee's emails; a report by Barlow on the searches; Barlow's other notes about the searches; training materials from the Indiana State Police used by Wolf and Barlow to create the new search procedure; and Wolf's calendar of meetings concerning the searches.

The court has denied the City of Madison's motion for summary judgment on the municipal liability claim, and it is unlikely that any newly discovered

evidence would require summary judgment for the plaintiffs on that or any other claim. The court will not allow further summary judgment briefing. The court will re-open discovery for a limited time to permit the plaintiffs to take additional depositions on issues discovered in the untimely discovery responses. Under Rule 37, the court will also order the responsible defendants to pay as a sanction the plaintiffs' reasonable attorney fees and costs for reasonably necessary follow-up depositions. The court will confer with counsel in the near future to establish specific deadlines, a new trial date, and a process for dealing with the fee issue.

*Documents Under Seal*

The court issued a show cause order on May 27, 2009, directing the parties to explain why certain docket entries remain under seal. The parties explained that several docket entries were sealed because they included personal identifiers, and they said that redacted versions of the docket entries were included in the record. The problem is the breadth of documents that are currently under seal. All of docket entry 112, plaintiffs' designation of evidence in support of their first motion for summary judgment, is under seal. The plaintiffs have submitted redacted exhibits for only part of docket entry 112. Dkt. No. 134. The court unseals those portions of docket entry 112 that have not been submitted in redacted form.

*Conclusion*

Royce's motion for summary judgment and the other officers' motion for summary judgment are granted in part and denied in part.  Dkt. Nos. 103, 158. Madison and the supervisory defendants' motion for summary judgment is granted in part and denied in part.  Dkt. No. 155.  The fire defendants' motion for summary judgment is granted.  Dkt. No. 152.  Plaintiffs' first motion for summary judgment is granted in part and denied in part.  Dkt. No. 109.  Plaintiffs' second, third, and fourth motions for summary judgment are denied.  Dkt. Nos. 113, 117, 120.  Defendants' motion to strike is denied.  Dkt. No. 153.  Plaintiffs' motion to permit further summary judgment briefing and re-open discovery is granted in part and denied in part.  Dkt. No. 180.  Plaintiffs' motion to amend the complaint is denied.  Dkt. No. 124.  The appeal of the magistrate judge's order unsealing documents is denied, Dkt. No. 229, and the appeal of the magistrate judge's order granting the motion to compel is sustained, Dkt. No. 221.  The motion to strike plaintiffs' reply to defendants' appeal on the motion to compel is denied.  Dkt. No. 223.

So ordered.

Date: August 21, 2009

_David F. Hamilton_

_____
DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

Dwight Timothy Born
TERRELL BAUGH SALMON & BORN LLP
tborn@tbsblaw.com

William Edward Jenner
JENNER AUXIER & PATTISON, LLP
wjenner@wjennerlaw.net

Joseph A. Colussi
COLUSSI LAW OFFICE
colussilaw@msn.com

Steven Craig Jackson
FERGUSON & FERGUSON
scj@ferglaw.com

James S. Stephenson
STEPHENSON MOROW & SEMLER
jstephenson@stephlaw.com

Ian L. Stewart
STEPHENSON MOROW & SEMLER
istewart@stephlaw.com

R. Jeffrey Lowe
KIGHTLINGER & GRAY, LLP
jlowe@k-glaw.com